BLANTON v. KENTUCKY DISTILLERIES & WAREHOUSE CO.

(Circuit Court, E. D. Kentucky. March 10, 1902.)

1. ASSIGNMENTS FOR BENEFIT OF CREDITORS—SALE OF REAL PROPERTY BY ASSIGNEE—KENTUCKY STATUTE.

Under Ky. St. § 87, relating to sales of property by assignees in voluntary assignments for the benefit of creditors, since its amendment by Act March 16, 1898 (Sess. Acts 1898, p. 104), an assignee has power to sell real property at private or public sale, as he deems best, and to pass the title pursuant thereto, by virtue of the power of sale given in the deed of assignment;—the effect of the amendment being to repeal the limitation contained in the original section, requiring real property to be sold in the same manner as at decretal sales, which was by public auction.

2. SAME—NECESSITY OF APPRAISAL.

The provisions of Ky. St. § 2362 et seq., which require an appraisal "before any real estate shall be sold under an order or judgment of a court, other than an execution," have no application to a sale of real property by an assignee for the benefit of creditors pursuant to section 87 of such statutes, in which case the power of sale is not derived from an order or judgment of a court, but from the deed of assignment, and the court is vested only with a supervisory power to confirm or reject the sale when reported by the assignee.

3. SAME—IRREGULARITY IN APPRAISEMENT—EFFECT OF CONFIRMATION OF SALE.

Conceding that such statutory provisions do apply, and that an appraisal is required in such case, the fact that certain personalty used

in connection with the real property, and sold with it, was included in the appraisement,· is merely an irregularity, which is cured by a confirmation of the sale as provided by the statutes, without any exception having been filed thereto.

4. EVIDENCE—PROCEEDINGS OF STOCKHOLDERS' MEETING—PROOF BY ORAL TESTIMONY.

The proceedings of a meeting of the stockholders of a corporation are facts which may be proved by the oral testimony of any witness who was present, and especially is such evidence admissible where it is shown that the record book containing the minutes of the meeting has been lost.

5. ASSIGNMENT FOR BENEFIT OF CREDITORS—VALIDITY—CORPORATION.

A deed of assignment conveying the property of a corporation for the benefit of creditors, executed pursuant to the action of the board of directors, although not previously authorized by a vote of a majority of the stock as provided by the articles of incorporation, will convey a good title to the assignee, where the corporation was admittedly insolvent, and after the lapse of four years, during which the assignee has been actively engaged in settling up its affairs, none of the stockholders. have questioned the validity of the assignment.

6. SPECIFIC PERFORMANCE—TITLE TO SUSTAIN SUIT—LIENS.

An assignee for the benefit of creditors may maintain a suit for the specific enforcement of a contract by which he sold real property belonging to the assigned estate, covenanting to give a clear title,. notwithstanding the existence of liens thereon, where it is agreed between him and the lienholders that they are to be paid from the proceeds. of the sale, and they are made parties to the suit.

7. SAME—DEFENSES.

The revenue laws of Kentucky provide for the assessment annually of whisky in bonded warehouses, and require the warehouseman every four months to report all removals, and to pay the taxes previously assessed against the whisky so removed. But by virtue of Ky. St. § 4021, the state and county each have a lien on the whisky for the taxes assessed thereon, and section 4109 expressly gives the warehouseman who pays the taxes a lien thereon for the amount paid, with interest. Hence a purchaser of a distillery and warehouse in which whisky owned by others. is stored cannot be subjected to loss on account of taxes due on such whisky, nor make such fact a defense against a suit for specific performance, whatever may be the conditions of the warehouse receipts,. which cannot bind him in the matter of taxes.

8. SAME.

A purchaser of a distillery property, who, in making the contract, accepts the personal agreement of the vendor that he will retain in his. hands sufficient money from the price to pay the state and county taxes on whisky of third parties stored in the warehouse, as the same shall from time to time be withdrawn, cannot make the fact that such. payment is not required at the time of delivery of the deed a defense· to a suit for specific performance.

9 SAME.

Where, at the time of the making of a contract for the sale of distillery· property, there was a large quantity of whisky stored in the bonded· warehouse, but no provision was made in the contract for any liability on the part of the vendor on account of the tax due the United States on· such whisky, the purchaser cannot defend against a suit for specific performance on the ground that in case the whisky, from excessive outage, or other cause, should prove insufficient in value to pay the tax, the· government may enforce a lien therefor against the premises.

10. SAME—CONDITIONS PRECEDENT—TENDER OF DEED BY VENDOR.

Where a contract for the sale of property consisting of both personalty and realty provided that the purchaser should divide the consideration between the two deeds to be made, and should furnish the vendor· with forms for such deeds, which it refused to do on demand, the vendor·

was not bound to tender a deed, as a condition precedent to the commencement of a suit for specific performance.

**11. SAME.**

A tender of a deed by a vendor is not essential, to enable him to maintain a suit for specific performance, where the purchaser has notified him that he will not comply with the contract.

**12. SAME—INSUFFICIENT TENDER.**

A tender of a deed by a vendor which is insufficient, but was intended to be in compliance with the contract, will not defeat his right to a specific performance in equity, even where a tender is essential.

**13. SAME—DEFENSE—WANT OF MUTUALITY OF CONTRACT.**

The fact that a vendor at the time of the making of a contract for the sale of property was not in a position where he could be compelled to specifically perform a part of his agreement relating to a collateral matter, not of great importance, does not create such a want of mutuality as will defeat his right to a specific performance, where such fact was known to both parties, and the contract was made in good faith, and has not been rescinded on that ground by the purchaser, and where the vendor has since obtained the things which he agreed to procure and deliver, and has placed himself in a position where he can be compelled to fully perform by the decree of the court.

## In Equity. Suit for specific performance.

This is a suit to enforce specific performance of a contract of sale of the Edgewater Distillery plant, located at Lair, in Harrison county, Ky., and certain personal property connected with its operation and business. The contract is dated April 6, 1899. It includes claims for storage for whisky in the bonded warehouse, but does not include any whisky. The price to be paid is $40,000 cash. The vendor in the contract is the complainant, J. I. Blanton, assignee of the T. J. Megibben Company, a Kentucky corporation, who acquired the property from it under a deed of assignment for the benefit of its creditors made July 1, 1898. When the contract was made, he had been authorized and directed by the county court of Harrison county, at its regular March term, 1899, held March 29th, to sell all of the property of his assignor at public or private sale, as he deemed most advantageous; the sale, if public, to be on certain specified terms, and, if private, to be reported in writing to the court for its confirmation. The vendee is the Kentucky Distilleries & Warehouse Company, a New Jersey corporation, organized February 3, 1899, to purchase and operate distilleries and warehouses in Kentucky. Its principal office has been in New York City. It has also had an office at Frankfort, Ky., kept by Mr. W. E. Bradley, its assistant treasurer, and highest official in the state, and one at Louisville, Ky., kept by Mr. Charles H. Stoll, its agent, up to July 1, 1899, to purchase for the distilleries and warehouses, close the contracts therefor, and cause them to be transferred to it, and its general solicitor in charge of its legal affairs in Kentucky since July 1, 1899, and whose residence during this time has been at Lexington, Ky. It has had as its general counsel the legal firm of Moran, Kraus & Mayer, of Chicago, Ill., with an office also in New York City. Mr. Alfred S. Austrian, a member of that firm, has spent a portion of his time at the Louisville office. It has also had in its employ the legal firm of Pirtle & Trabue, of Louisville, whose duty it has been to examine and pass upon the title to the various properties purchased by it, and Mr. Richard C. Stoll, a lawyer of Lexington, Ky., whose duty it has been to verify by personal investigation the abstracts of title furnished by the vendors. In addition, it has employed specially, with reference to particular litigation, the legal firm of which Judge A. P. Humphrey, of Louisville, has been a member.

At the time of the making of the contract involved herein, Mr. Charles H. Stoll had purchased in his own name for defendant between 50 and 55 distilleries in Kentucky, and was then engaged in closing those contracts, and causing the properties to be transferred to defendant. He did not make the purchase of the property in question herein. It was bought by another agent of defendant, and contrary to his judgment and advice. He, however, drafted

the contract, and executed it on defendant's behalf, in pursuance to written authority dated March 28, 1899, whereby he was directed to look after the transaction, see that it was properly closed, and that defendant got an absolutely good title to the property, and a subsequent telegram, dated April 17, 1899, urging him to execute it at once. This he did on April 20, 1899, when its execution became complete. The provisions of the contract, so far as material to the issues in this case, and stripped of their verbiage, are as follows, to wit: Within ten days, complainant was to deliver to defendant an abstract of title to the real estate sold, and within the same time report the sale to the county court of Harrison county, and recommend its approval. If it was approved, within ten days thereafter he was to execute and deliver to defendant, at its office in Louisville, upon a day to be fixed by him, two deeds for the property sold,—one, a general warranty deed, conveying an unincumbered fee-simple title to the real estate, and the other conveying the personal property,—of which day three days' previous notice was to be given to it or ·Mr. Charles H. Stoll at said office. The division of the consideration for the entire property sold between the two deeds was to be fixed by defendant, and, within three days after receipt of notice of confirmation of the sale, it was to prepare and deliver to complainant form of deeds required for the transfer. The property, at the time of the delivery of the deeds, was to be clear of all liens, charges, incumbrances, taxes, and assessments, and all taxes against the whisky in the bonded warehouse, save those due the United States, which could not be collected under the terms of warehouse receipts issued therefor, were to be paid at that time, or a sufficient fund was to be reserved in the hands of complainant to pay for same from time to time, as the whisky was taken out of bond. Complainant, without further consideration, was to procure and deliver to defendant, along with the distillery property, certificates for at least 90 per cent. of the capital stock of his assignor, the T. J. Megibben Company, and the resignation of its directors and officers, and to cause a meeting of its board of directors to be held at Cynthiana, Ky., at such time as defendant should indicate, for the purpose of receiving the resignation of the directors, one at a time, and installing a new board of directors, to be nominated by defendant, or by such person or persons as might become holders of said stock at its request; and complainant was to guaranty the storage claims to amount to as much as $5,000, or he might elect not to transfer said storage claims when the contract was closed, and accept $35,000 in cash, and within 90 days thereafter transfer them, with a guaranty to make good any shortage from $5,000, and demand $5,000 cash therefor, or with a guaranty to make good any shortage from $3,600, and demand $4,000 cash therefor. The sale was reported by complainant to said county court on April 22, 1899, with a recommendation that it be approved, which was within the stipulated 10 days. Chapter 7 of the Kentucky Statutes, in relation to assignments for the benefit of creditors, provides that a sale of real estate by an assignee under a voluntary deed of assignment, reported to it, may be confirmed at the second regular term of the county court after it is reported. This sale, so reported, was confirmed by said county court at its regular May term, 1899, held May 29th, which was the second regular term thereof after its report. The same day complainant mailed to Charles H. Stoll an abstract of title to said real estate. This was not within the time stipulated, but no point was ever made of the delay; and it seems to have been occasioned by time taken to procure certain deeds deemed essential to perfect the record title to the distillery plant, hereinafter referred to. Charles H. turned the abstract over to Richard C. Stoll, and so notified complainant by letter June 8, 1899. About that date Richard C. Stoll went to Cynthiana, the county seat of Harrison county, and made a personal investigation as to the title. He seems to have turned the abstract, with the result of his investigations, over to Pirtle & Trabue. June 23, 1899, they, by letter to the legal firm of Blanton & Berry, of which complainant was a member, notified him that certain things should be done "in order to perfect the title to the property." Those things were as follows, to wit: (1) The confirmation of the sale should be set aside, the property appraised, a resale had, and a new report of sale made within 10 days after this sale. This, because the property had not been appraised; it being their opinion that the

statute required an appraisement, and that before a sale. (2) The deeds procured to perfect the record title should have revenue stamps affixed to them. (3) A mortgage, execution, and attachment lien in favor of Lewis Lebus, and three separate mechanics' liens in favor of J. T. Megibben, R. E. Hall, and P. R. Megibben, should be satisfied and released of record. (4) The assignor, the T. J. Megibben Company, should unite with the complainant in the deed, because said deeds to perfect the record title had been made to it since the assignment. They suggested that an agreement might be made whereby the lien creditors referred to would release their respective liens, and look to the proceeds of sale in complainant's hands for payment. Complainant went at once to Louisville, and on June 24, 1899, had a personal interview with Judge Pirtle. According to complainant's testimony, it was then and there agreed between them that it was not necessary that the appraisement should have been made prior to the sale, but that it would be sufficient if the order of confirmation were set aside, the property appraised, a new report of sale, accompanied by the appraisement, filed, and a confirmation thereof at the second regular term of the county court after the report was filed had. Judge Pirtle does not deny this conversation. He simply states that he has no recollection of it, and this after his attention was called, with some persistence, to an assumed inconsistency thereof with his letters before and after the interview. June 26, 1899, an appraisement was had, and a new report of sale, with the appraisement, was filed in the county court. The appraisement is not dated. Even the officer's jurat is undated. There is nothing about it to show when it was made. The report does not state anything as to this. From a reading of the report, one would infer that it was made before the sale. Whether it was thought that in this way any trouble on account of the appraisement not being before the sale would be obviated, and Judge Pirtle's objection was removed by a suggestion that this could be done, does not appear from anything in the record. It is obvious, however, that the time of the appraisement was designedly kept from the record, and at least it was not allowed to appear that it had been made after the sale. At the regular July term, 1899, held July 24th, this new report of sale was confirmed. On the same day, complainant mailed a copy of the order of confirmation to Mr. Stoll, at Louisville, and inquired of him when it would suit to close the matter up, and expressed the hope, on account of the absence from home of his partner, Mr. Berry, that he could not make it convenient to do so for two weeks. Mr. Stoll was at the time in Michigan, on a vacation, and this letter was forwarded to him there. July 31st he acknowledged receipt thereof, with inclosure, and said:

"I am sending this to Pirtle & Trabue for their opinion. Upon its return, if satisfactory, a deed will be prepared, and I will be ready for settlement with you, though it will not be necessary for you to leave home, as arrangements will be made to settle there upon the execution of the deed."

This order of confirmation was premature, because the July term, 1899, was not the second regular term after the new report of sale, with the appraisement, had been filed. It was not due until the regular August term, 1899. August 14th Mr. Stoll, after he had word from Pirtle & Trabue, wrote complainant's firm a letter, and inclosed therewith a copy of Pirtle & Trabue's letter to him. In it he said:

"I should be glad to have you take this matter up directly with Messrs. Pirtle & Trabue, and respond to the suggestions which they make in their letter to me. Will you not kindly favor me with carbon copies of your letter to them? They will send me copies of their letters to you, so that I will keep fully posted as to the negotiations between you,—unless Mr. Blanton may see fit to go to Louisville, and confer with Judge Pirtle, and reach a conclusion at once as to what is necessary to be done."

The letter of Pirtle & Trabue to Mr. Stoll, which was so inclosed, was dated August 2d. The only positive suggestion it contained was that the order of confirmation of the new report of sale was premature, and should therefore be set aside, and the report of sale lie over to the regular August term, 1899, for confirmation. The other suggestion it contained is in these words:

"In our letter to Messrs. Blanton & Berry, we suggested that, if there had not been a proper appraisement of the property before the sale, the first sale

should be disregarded, and a new sale made and reported within ten days after the sale. While it may be that the provision of the statute that the sale shall be reported by the assignee within ten days after the sale is directory, and not mandatory, yet the provision of the statute regulating sales of real estate should be strictly followed. It would save time to have Messrs. Blanton & Berry report directly to us in this matter. We are not disposed to hold that the direction that the report of sale shall be filed within ten days after the sale is mandatory, but we have no question that the report of sale should lie over to the August term of court."

Defendant contends that Pirtle & Trabue, in this letter, renewed and insisted upon the suggestions contained in their letter of June 23d, that the appraisement should be before the sale, and, in aid of this position, would have attention directed exclusively to the first sentence of this extract therefrom. But when that sentence is considered in connection with what follows, it is at least ambiguous whether such was the case, and whether or not, notwithstanding the reference to their former suggestion, the sole matter they are considering was the effect of the fact that the report of sale had not been filed within 10 days after the sale. As to this, they state that, though they had no question that the report of sale should lie over to the August term of the court, they were not disposed to hold that the provision of the statute was mandatory. But complainant seems to have considered this letter as a renewal of the former suggestion. August 19th complainant's firm wrote Pirtle & Trabue in regard to the suggestions contained in the letter. In it they stated distinctly that the appraisement had not been made before the sale, but had been made afterwards, and filed with the new report of sale, and that that report would be confirmed on August 28, 1899,—the regular August term. They added:

"It seems to us that, under the order of sale and the contract of sale in this case, the sale of this property privately, when confirmed by the Harrison county court, would be valid without the appraisement ordinarily required prior to making the sale; but, if you gentlemen hold a different opinion in regard to this matter, then the only way an appraisement can be had prior to the sale will be for the assignee to have the property appraised, and then thereafter enter into another contract of sale with Mr. Stoll; but we would regret very much to have this matter delayed so long as this would require, as there had been no exceptions filed to the sale. We will be glad to hear from you at your earliest convenience on this point."

A letter was also written to Mr. Stoll, in Michigan, on this same date. In it was inclosed a copy of this letter to Pirtle & Trabue. Complainant seems to have been absent from home when these letters were written. August 21st, he having returned, his firm wrote another letter to Pirtle & Trabue, in which they explained that the report of sale was filed June 26, 1899, and the premature order of confirmation had been entered by mistake, and stated that it had been set aside, and the matter continued until the August term. They added:

"If there are any other defects, please advise us at once, as our county court day is next Monday. If you think the appraisement should antedate the date of sale, the only thing we can do now is to enter into a new contract of sale, as of a different date, subsequent to the appraisement. We do not, however, deem it necessary that this should be done."

August 22d Pirtle & Trabue answered both of said letters from complainant's firm at the same time. They said:

"We think, after the order of confirmation of the sale has been entered at the August term of the court, that the objections heretofore made will be cured. We think we have expressed this opinion heretofore, when we stated that it should not be necessary to begin over again from the beginning in this matter. We should like to have the order entered on the 28th day of August, approving and confirming the sale. The above opinion is given upon the assumption that the last report of sale shows that the appraisement was made prior to reporting the sale. We should like to see the last report of the sale. As soon as we hear from you that the order confirming the sale has been made, we will prepare a deed and send it to you."

The report of sale was confirmed at the regular August term, 1899, held

August 28th. August 29th complainant mailed to Pirtle & Trabue copies of the orders setting aside the order confirming sale at the July term, and continuing the case until the August term, and confirming the sale, and directing a deed to defendant. August 30th, Pirtle & Trabue acknowledged receipt of these copies. They added:

"These orders seem to us all that is necessary. We will prepare at once a deed, and send it to Mr. C. H. Stoll for his approval, with the request that, upon approving same, to forward it to you for execution, and he will then arrange for the delivery of the deed and the payment of the money."

September 5th Mr. Alfred S. Austrian, of the firm of Moran, Kraus & Mayer, wrote complainant a letter from Chicago, in which he said:

"I have been advised that you are now ready to turn over the Megibben plant. Will you kindly tell me how the matter stands, and when you will be ready to finally consummate the entire transaction?"

The record does not disclose how he had been so advised. The reasonable inference is that he had been so advised by Mr. Stoll, to whom Pirtle & Trabue had sent the deed which,they had prepared. September 7, 1899, complainant answered this letter, and stated:

"Certified copies of the orders of court approving and confirming the sale, and ordering the deed executed by me, as assignee, were forwarded last week to Messrs. Pirtle & Trabue, who thereafter notified me that they had received the same, and that they approved the title, and that the orders were sufficient, and that they would prepare a deed, and send to Mr. Stoll, who is now in Michigan, for his approval. Since then we have heard nothing from either Messrs. Pirtle & Trabue or from Mr. Stoll. Most any old time will suit me, to consummate the trade, as we are not very busy at this time."

September 14th Mr. Austrian wrote complainant, acknowledging receipt of his letter, and stating:

"I expect to be in Louisville inside of the next week or ten days, at which time I will be pleased to take up the matter of the Megibben plant, and bring the same to a conclusion."

Before proceeding with the narration, it will be well to pause and take stock of the condition of things at this time. Defendant's attorneys, Pirtle & Trabue, after the personal investigation of Mr. Richard C. Stoll and examination of the abstract, had approved the complainant's title, save so far as stamping said deeds, and releasing the liens referred to in their letter of June 23d; and these matters, if not already attended to, could be, before or at the time of closing the trade. And Mr. Austrian, one of the defendant's general counsel, had informed them that within a week or 10 days he would be in Louisville, and bring the matter to a conclusion. It is claimed by defendant that Pirtle & Trabue had not authority to bind it by an approval of the title, and that their sole authority was to examine and report on the title. In the case of Kentucky Distilleries & Warehouse Co. v. Warwick Co., 48 C. C. A. 363, 109 Fed. 280, involving litigation as to another distillery, Mr. Stoll testified that their authority was to examine and pass on the titles to properties purchased. No limitation on their authority was intimated in that case. But as the question of their authority was not involved therein, no stress can properly be laid on this fact. However this may be, it is certain that Pirtle & Trabue did more than merely examine the title to the property involved herein, and report on it to the higher legal authority. They took up the matter of title with complainant; told him what, in their opinion, was necessary to be done to make the title acceptable to defendant; and, after he had complied with their suggestion, notified him that all had been done that was necessary. It is further certain that Mr. Stoll, who had been specially empowered to execute the contract on defendant's behalf, and to close it and see that it got a good title, and who was its general solicitor after July 1, 1899, and, as such, in charge of all its legal matters in Kentucky, knew that Pirtle & Trabue had done this, and did not inform complainant that they had no authority to do it, or to bind defendant by what they had done. And still further, in his letter of July 31st he informed complainant that, if the opinion of Pirtle & Trabue was satisfactory, he would be ready for settlement with him, and that it would not be necessary for him to leave home, as he would make arrangements to settle with him there; and in his letter

of August 14th he intimated to complainant that he might take the matter up with Pirtle & Trabue, and negotiate with them,—each side to send him carbon copies of their letters, to keep him posted,—or, if he saw fit, he might go to Louisville and confer with Judge Pirtle, and reach a conclusion at once as to what was necessary to be done. It is not unreasonable to infer that Mr. Austrian's inquiry of complainant as to when he would be ready to consummate the transaction, and subsequent notification as to the time when he would be in Louisville, and would be pleased to bring the matter to a conclusion, was due to some communication from Mr. Stoll after he had received a letter from Pirtle & Trabue to the effect that all that was necessary had been done, and inclosing the proper form of a deed.

There have been left out of the narration as to what transpired in connection with the sale in question herein certain acts on the part of certain agents of defendant indicating a purpose to take the property under the contract,— such as making contracts with certain persons to superintend the property, having it insured, and for telephone service in connection with it,—as we deem it unimportant to determine how far they were authorized by it, or what is their precise bearing in this case.

It must be accepted, therefore, as a fact in this case, that defendant, through its authorized agents, had by the middle of September, 1899, informed complainant that it was satisfied with his title, and would within a week or 10 days conclude the transaction with him. Whatever significance or value this fact is entitled to in this case must be given to it. The week or 10 days referred to in Mr. Austrian's letter of September 14th expired without any word from him. Indeed, complainant heard nothing from him until he received a letter dated December 13, 1899. This was after complainant had written him five letters in succession, dated, respectively, October 5th, October 7th, October 24th, December 2d, and December 11th; the first two being addressed to him at Louisville, and the last three at Chicago. In the first, complainant expressed a hope that he would not be wanted in Louisville before the latter part of the following week, in order to finally transfer the plant. In the next he withdrew this expression of hope, and stated that he would be ready to close up the deal any day that or the following week, and that he would be glad to hear from him. In the next he called Mr. Austrian's attention to the fact that since the letter of September 14th he had heard nothing from him; stated that the creditors were making constant and repeated inquiries regarding the sale, and he was anxious to complete it as soon as possible; and requested that he advise him what date it would suit him to turn over the property. Between this and the next letter, about the middle of November, 1899, complainant sent his partner, Mr. Berry, to see Mr. Stoll in regard to the matter; and Mr. Stoll informed him that he knew nothing about it, that he had no idea when defendant would accept the property, and that the matter was entirely out of his hands, and in fact had never been in his hands, inasmuch as the purchase was not made by him, but by others. In his next or fourth letter, complainant informed Mr. Austrian of this visit and its result, and requested him to fix a time, and take up the transfer of the property at once. In the last letter, which was answered, complainant again requested appointment of a day for the consummation of the trade. In his answer thereto, dated December 13th, Mr. Austrian stated that complainant's letter of the 11th had been referred to Mr. Levi Mayer, who was then out of the city, and that as soon as Mr. Mayer returned he would endeavor to give a reply. December 14th complainant wrote Pirtle & Trabue. He called their attention to their letter of August 30th, and to the fact that he had heard nothing from them or Mr. Stoll since then, and stated that his partner, Mr. Berry, had called on Mr. Stoll, and been told by him "that he was not informed in regard to the affair at all"; that he would be glad if they would act upon their suggestion of August 30th, and prepare papers, in order that he might close the matter up; and that he had written Mr. Austrian, who had written him subsequent to the date of their letter, that he would be in Louisville shortly and take the matter up, but that he had not seen fit to answer any of his letters of recent date. Pirtle & Trabue answered this letter December 15th, and stated that they had referred it to Mr. C. H. Stoll, at Lexington. December 18th Mr. Levi Mayer

wrote complainant, as Mr. Austrian had said he would do in his letter of December 13th. In it he said:

"We have carefully gone through the papers and documents connected with the Megibben property transaction, and have come to the conclusion, and have so advised our client, that you have not complied with the agreement, that the title is imperfect, and that there are several other substantial breaches of the conditions which were to be performed on your side. We have also had the matter gone over by local Kentucky lawyers, who have come to the same conclusion as we have arrived at. Mr. C. H. Stoll, of Lexington, has also investigated the matter, and is quite familiar with the details, and is not far from where you are. Doubtless you could arrange to have a personal conference with him. I am sending him a copy of this reply, and also of your letter of the 11th inst."

Complainant seems to have been loath to comply with Mr. Mayer's suggestion to take the matter up with Mr. Stoll. This, no doubt, was because Mr. Stoll's statement to Mr. Berry in the middle of November that the matter was out of his hands, and perhaps, also, because his letter of December 14th to Pirtle & Trabue had been sent to Mr. Stoll, as they wrote complainant, and had called forth no communication from him, and was therefore not unnatural. Instead, he kept up a correspondence with Mr. Mayer. He complained of his treatment; sought for detailed information as to wherein his title was defective, and he had failed to comply with his agreement; and inquired as to who was authorized to close the matter with him. Mr. Mayer, in his responses, adhered to the position taken in his letter of December 18th, and referred complainant to Mr. Stoll for the detailed information sought. Finally, finding that he could make no further headway with Mr. Mayer, complainant arranged with Mr. Stoll for a meeting at Lexington to confer about the matter. Pursuant to appointment, he met him there on January 16, 1900. According to complainant's account of the interview, Mr. Stoll notified him that defendant would not accept the plant, because there were such material defects in the title that defendant could not accept it, and, upon his request to name them, mentioned none that had not been referred to by Pirtle & Trabue, as to which an understanding had been had. According to Mr. Stoll's account of it, it was his purpose then to inform complainant as to all the defects that had been found to exist; and he began by telling him that it was defective because of the want of a proper appraisement, and complainant refused to permit him to name any others. They agree that on that occasion complainant requested Mr. Stoll to furnish forms of deeds called for in the contract, so that he might prepare and tender them to the defendant, which he refused to do, and that Mr. Stoll, in effect, informed complainant that Mr. Bradley, the assistant treasurer at Frankfort, was the proper person to whom to make a tender. The information conveyed by the letters of Mr. Mayer and the interview with Mr. Stoll was the first that complainant had since the letter of Pirtle & Trabue, of August 30th, and Mr. Austrian, of September 14th, that a change had taken place in defendant's attitude towards complainant's title, and that it had determined not to accept a conveyance of the property and to comply with its contract. The record does not disclose the cause of this change and determination. Complainant's counsel would have it that it was due to the fact that defendant had come to Mr. Stoll's opinion that the purchase was not a good one, as a mere business venture, and the alleged defectiveness of title was put forward as an excuse to get out of the contract. There is reason, however, to suspect, at least, that defendant had come to a real doubt as to title, if not conviction that the complainant's title was not good, and, though it may have been glad to be released, that its claim as to defectiveness of title was a sincere one. Mr. Stoll testifies that he reached Louisville on his return from his vacation in Michigan about September 18th, and met Mr. Austrian there, and that between September 18th and November 13th he consulted with Judge A. P. Humphrey, who, as heretofore stated, was defendant's attorney in connection with certain special litigation about the title to this property; and thereafter, and before November 13th, he made a report in regard thereto to the general counsel, Moran, Kraus & Mayer. Judge Pirtle, in his testimony, also speaks of an argument with Judge Humphrey in regard

to the title, which was of such a nature as to blur his recollection as to what took place between him and complainant on June 24th as to the matter of appraisement. This consultation with Judge Humphrey, and this argument between him and Judge Pirtle, and subsequent report by Mr. Stoll to Moran, Kraus & Mayer, suggests that, as a result of this consultation and argument, a serious doubt, at least, as to complainant's title, arose, and defendant was affected by it. But however this may be, it is certain that defendant was very remiss in not letting complainant know the change of its attitude towards his title very much sooner than it did,—particularly in view of the letters of Pirtle & Trabue of August 30th, and Mr. Austrian's of September 7th and 14th. It did not seem to consider that it was incumbent on it to give complainant any information in regard to the matter of its own accord, and none was received by him until he had, by repeated efforts, tried to obtain it. However, it is entirely immaterial whether defendant refused to accept a conveyance from complainant and to comply with its part of the contract, because of a desire to get rid of a bad bargain, or because of a sincere conviction that it could not obtain a good title from complainant. The main thing to be considered is whether complainant is able to pass a good title, and defendant is bound to accept it. As said by Kekewich, J., in the case of Wylson v. Dunn, 34 Ch. Div. 569:

"The proceedings do not disclose the reason why she does not desire to purchase the piece of land. Possibly she does not wish now to build there, or to live in that neighborhood. But it is immaterial to me why that state of things has been brought about. If she is bound to purchase the piece of land, her wish to get rid of it will not avail her. If, on the other hand, she is not bound to purchase the piece of land, no consideration of her reasons ought to influence or will influence the court."

February 2, 1901, complainant made a tender of a deed to the property sold, and certain other papers, to Mr. Bradley, on behalf of defendant, at its Frankfort office, which he refused to accept. The details of this tender, so far as important, will be stated hereafter. And thereafter, on the same day, this suit was brought in the circuit court of Harrison county, from whence it has been removed to this court.

Blanton & Berry and Helm, Bruce & Helm, for complainant.

C. H. Stoll and Humphrey, Burnett & Humphrey, for defendant.

COCHRAN, District Judge (after making foregoing statement). It is now in order to consider the various defenses which the defendant relies on to defeat complainant's right to the relief he seeks, and they will be taken up and disposed of one at a time.

1. Inability of complainant to perform his part of the contract is urged, and many reasons are set forth for claiming that this inability exists. These reasons, and the court's views as to their sufficiency, are as follows:

(1) It is claimed that such inability exists because of the fact that the contract of sale was a private one. It is contended that an assignee for the benefit of creditors cannot make a private sale of the real estate held by him under a voluntary deed of assignment, and that, therefore, even though such sale may be authorized and confirmed by the county court, he cannot pass the title to such property in pursuance to such a contract of sale. The effect of this position, it will be noticed, is not only inability on complainant's part to perform his contract, but also that his contract is void. Prior to the act of March 16, 1894, entitled "An act relating to voluntary assignments" (Sess. Acts 1894, p. 189), and chapter 7 of the Kentucky Statutes, there were but two statutory provisions in Kentucky in relation to such assignments. One was what is known as the "statute of 1820,"

and contained in section 22, art. 1, c. 63, Gen. St., and the other an act approved March 8, 1876, contained in chapter 109, Gen. St. (Ed. 1887). The latter statute provided for the assignee executing bond in the county court, and filing therein an inventory and report of the sales made by him, and nothing more. The former statute was in these words:

"No sale made of any real estate by a trustee by virtue of a deed of trust or pledge to secure the payment of debts shall be valid, nor shall the conveyance by such trustee pass the title of the property specified in such deed or pledge, unless the sale thereof shall be in pursuance to a judgment of court or the maker of such deed or pledge shall join in a writing evidencing the sale."

The effect of this statutory provision upon such instruments is thus stated by Judge Simpson in the case of Ely v. Hair, 16 B. Mon. 230:

"Mortgages and deeds of trust, with respect to a sale of the property embraced by them, are placed substantially upon the same footing by the laws of this state. No sale can be made under a deed of trust without the intervention of a court of equity, unless it be made with the consent of the grantor. A sale of the mortgaged property may be made in the same way, the mortgagor and mortgagee concurring therein."

To the same effect are remarks of the same learned judge in the case of Lyons v. Field, 17 B. Mon. 549. Though this is undoubtedly true, there is a difference between the terms of a voluntary deed of assignment for the benefit of creditors and those of an ordinary mortgage. The former contains a power of sale in the assignee. The latter contains no such power. The result is that, if the statute had not been enacted, the assignee, under such a deed, would have had the power to sell and convey the property covered by it independent of a court of equity or the assignor, and without any limit upon it other than what might be contained in the instrument itself, or put upon it by the principles of ordinary business prudence. In the case of Hahn v. Pindell, 3 Bush, 189, Mr. Chief Justice Robertson, in speaking of a special statute repealing the act of 1820 as to a certain corporation, said:

"The inevitable effect of the literal import of that legislative enactment is to restore the common-law right, without the intervention of a court of equity, to sell mortgaged property in execution of a power given in the mortgage, and so far as to abrogate the Kentucky statute of 1820."

He said further:

"There can be no judicial doubt that the common law legalized fair sales of mortgaged property, either real or personal, when made according to power to sell reserved in the mortgage. And it is historically true that such powers are the more prevalent in the most commercial cities and countries of the world."

In the case of Shinkle's Assignee v. Bristow, 95 Ky. 89, 23 S. W. 671, Pryor, J., said:

"It is plain the trustee has no power to sell or pass the title, except in the manner provided by the statute, and equally clear, but for the statute, the trustee could sell and pass the fee. * * * The statute intervenes and places a limitation on the power of the trustee only for the benefit of the grantor and creditors, and prohibits a sale and conveyance by him, unless by the direction of the chancellor or the consent of the grantor. It does not divest the trustee of the title, but says, in effect, 'You have the title, but

shall not pass it, except in the mode prescribed by the statute.' It will not be contended that the trustee would be without power to convey in the absence of this statute, and the limitation placed on his right to sell by its provisions only requires the passing of the title from the assignee in a prescribed mode, for, without this limitation, the trustee, being intrusted with title, could sell and convey at his own will and pleasure."

The way, therefore, this statute placed voluntary deeds of assignment and mortgages upon the same footing, was by curtailing the power of sale contained in the former. After its enactment the power could only be exercised in pursuance to a judgment of court or in conjunction with the assignor. So exercised, there was nothing in the statute preventing the sale under the power being either public or private, as might be determined by the court or by the parties to the instrument; and, when the sale was made, it was in pursuance to the power. This statute remained unchanged until the act of February 25, 1893, entitled "An act concerning lands," which forms chapter 150 of the Acts of 1891–93, p. 495, and first five articles of chapter 76 of the Kentucky Statutes. By section 20, art. 2, of said Act, section 2356, Ky. St., it was provided:

"No sale made of any real estate by a trustee by virtue of a deed of trust, or pledged to secure the payment of debts, shall be valid, nor shall the conveyance by such trustee pass the title of the property specified in such deed or pledge, unless the sale thereof shall be in pursuance to a judgment of the court, or shall be made by an assignee under a voluntary deed or assignment, or the maker of such deed or pledge shall join in a writing evidencing the sale."

The effect of this change in the phraseology of the statute of 1820 was to restore the law in relation to voluntary deeds of assignment to what it was prior to the passage of that statute. There was this difference, however, between the law as it was before the statute of 1820 and as it became after the act of February 25, 1893: The power of the assignee to sell in pursuance to the power of sale under the deed of assignment before the statute of 1820 was without statutory recognition. It was dependent solely upon the unwritten law. As it became upon the enactment of the act of February 25, 1893, that power was recognized, and impliedly, at least, declared, by statute. After the passage of this act, therefore, the assignee, under such an assignment, had power to sell independent of court and assignor. He had full and ample power to sell publicly or privately, as he deemed best, and to pass the title by his own deed to the purchaser. Such was the state of the law when the act of March 16, 1894, entitled "An act relating to voluntary assignments," and constituting chapter 7 of the Kentucky Statutes, was passed; and in construing the provisions of that act in relation to the matter in hand, in order to a proper construction thereof, this must be borne in mind. By section 14 of that act, which is section 87 of the Kentucky Statutes, it was provided:

"Personal property conveyed shall be sold by the assignee at private or public sale, as the court may direct; and the assignee shall have power to pass title to the same as fully as the assignor could have done at the date of the assignment. Real property shall be sold in the same manner and upon the same terms as real property sold at decretal sale, and the court shall make such orders concerning the advertisement of the sale as it deems

"proper, and the assignee shall have power to convey and pass all the right and title to the same, which the grantors in the deed of assignment had at its date. The report of sale shall be filed by the assignee within ten days after the sale. If no exceptions are filed thereto, the same shall be confirmed at the second regular term after it has been filed. If exceptions are filed, they shall be heard by the court and disposed of."

This section presupposes the law as it then existed in relation to such assignments, and as it continued in existence after the passage of that act. One provision of that law, which is presupposed, was that the assignee, under and by virtue of the terms of the deed of assignment, and the provision of section 20, art. 1, of the act of February 25, 1893 (section 2356, Ky. St.), had the power to make the sale and pass the title independent of court and assignor. Possibly another was the requirement of the act of March 8, 1876, requiring the assignee to report his sales to the county court. Hence there is no attempt in the section to provide that power to sell shall be conferred on the assignee by order of the county court, or that a report of sale shall be filed. It simply assumes that such power exists, and such filing shall be had. It provides that the exercise of the power of sale shall be under the direction and supervision, and subject to the approval, of the county court. As to personal property, it confers powers on the county court to direct whether it shall be sold at private or at public sale. As to real property, it provides that it shall be sold in the same manner and upon the same terms as real property sold at decretal sale. The manner and terms of sales of real property sold at decretal sales are prescribed by section 696 of the Civil Code of Practice. According to this provision, such sales must always be public. Hence the section in question required that real property sold under a deed of assignment should be sold at public sale, and cut off any power to sell such property at private sale. It conferred power on the county court to make such orders concerning the advertisement of the sale as it deemed proper. And it expressly conferred on the assignee power to pass title to the personal property sold by him as fully as the assignor could have done at the date of the assignment, and to convey and pass all right and title to the real property sold by him which the grantors in the deed of assignment had at its date. This, however, was simply declaratory of existing power, when exercised under the limitation prescribed by the section. This section was subsequently amended by an act approved March 16, 1898, found in Sess. Acts 1898, p. 104. That amendment added some words to the second sentence thereof, so as to make that sentence read as follows:

"Real property, when sold at public auction, shall be sold in the same manner and upon the same terms as real property sold at decretal sale, provided, the purchaser shall have the right to pay cash and the assignee to accept cash in payment of the purchase price at any such sale, and the court may make such orders concerning the advertisement of the sale as it deems proper, and the assignee shall have power to convey and pass all the right and title to the same, which the grantor in the deed of assignment had at its date."

The words so added, which affect the matter in hand, are contained in the conditional phrase, "when sold at public auction," inserted near the beginning of the sentence. Their addition removed the require-

ment thereof that real property sold by the assignee should be sold publicly. Before the addition, real property was to be sold in the same manner as real property sold at decretal sales, and therefore publicly. After the addition it was to be sold in that manner "when sold at public auction," or, in other words, it was to be sold publicly "when sold at public auction." Of course, this was an awkward way of removing that requirement. But there can be no doubt but that the object of the addition was to remove the requirement, and that it had that effect. If, then, this amendment had the effect of removing the requirement of this section of the act of March 16, 1894, that sales of real property by an assignee under a voluntary deed of assignment should be at public auction, does it not necessarily follow that since it became a law such an assignee has the right to sell publicly or privately, as he deems best, and pass the title thereto, in pursuance to such a sale? It would seem that it does. As we have seen, before the act of March 16, 1894, the assignee had the right to sell publicly or privately, and pass title in pursuance to such a sale, by virtue of the power of sale contained in the deed of assignment, and the implied recognition and declaration of section 20, art. 1, of the act of February 25, 1893 (section 2356, Ky. St.). The limitation put upon that power by that act being removed by the amendment thereto, it follows that since the amendment the assignee has the same power which he had before the act of March 16, 1894. The amendment leaves the power conferred by the terms of the deed of assignment, and impliedly recognized and declared by section 20, art. 1, of the act of February 25, 1893 (section 2356, Ky. St.), in full force and effect. The view that this amendment of the act of March 16, 1894, has this effect,. is strengthened by another amendment thereto, made by the act of March 16, 1898. Before the act of March 16, 1894, the county court did not have jurisdiction over voluntary deeds of assignment, other than such as was conferred by the act of March 8, 1876, which, as we have seen, was quite limited. Extended jurisdiction thereof was first conferred on the county court by the act of March 16, 1894. But jurisdiction of suits to settle assigned estates had long been exercised by the circuit court under the provisions of sections 428–438, Civ. Code Prac. Section 23 of the act of March 16, 1894, provided that, notwithstanding the extended jurisdiction conferred by the act upon the county court over such estates, the circuit court should still have jurisdiction to settle them as before, and that, when a suit for settlement should be brought in the circuit court, the jurisdiction of the county court should cease, and all papers should be transmitted by the clerk of the county court to the clerk of the circuit court. This section, if it did not have the effect of depriving the assignee, after a suit for settlement had been brought in the circuit court, of selling any part of the assigned estate, except so far as he might be empowered to do so by the judgment of the circuit court, at least was liable to that interpretation. By the amendment of March 16, 1898, to prevent any such effect, these words were added to this section, at its close:

"And the said circuit court shall have all the power and authority to administer and settle up the assigned estate, conferred on the county court by

this act, in addition to its power and authority heretofore existing as a chancery court, and the assignee shall have full power and authority to sell the personal and real property belonging to the assigned estate at public or private sale, and to convey and pass over the right and title to the same, which the grantors had in the deed of assignment at its date; and said assignee shall, within ten days after such sale, report same to the circuit court in which the suit for settlement of the estate is pending, and such report shall thereupon be laid over for ten days for exceptions, and if no exceptions are filed within that time, same shall thereupon be confirmed. If exceptions are filed, then such exceptions shall be heard and determined by the court." Acts 1898, p. 105.

There can be no doubt but that the effect of this amendment was to declare, if not to create, power in the assignee to sell publicly or privately, and that without any order or judgment of court, after jurisdiction had passed to the circuit court; it being provided that that jurisdiction after the passage should be the same as the county court. This amendment would seem to clearly recognize that before that passage, and whilst the jurisdiction remained in the county court, the assignee had the same power to sell publicly or privately as after the passage, and no good reason has been or can be assigned why he should not have it.

Counsel for defendant feel put to account for the amendment adding the conditional phrase, "when sold at public auction," to the section relating to proceedings when jurisdiction is in the county court. They suggest that it was intended thereby to provide that a certain course should be pursued in case of a public sale after jurisdiction had passed to the circuit court by the bringing of a suit for settlement therein. But this is to mix up two provisions that are entirely distinct and relate to proceedings at two separate and distinct stages. Section 14 of the act of March 16, 1894, as amended by the act of March 16, 1898, relates to proceedings whilst jurisdiction is in the county court, and section 23 of that act, as so amended, relates to proceedings after jurisdiction has passed to the circuit court; and it would seem that there is no sound reason for holding that the provisions of one section have any relation to those of the other. They are entirely separate and distinct.

The conclusion of the court, therefore, is that the complainant had power to make the sale involved herein. The statute authorized him to make a private sale, and the terms of the deed of assignment were full and ample in this particular. This does away with the necessity of considering the effect of the confirmation of the sale, even though there may have been no original power to make a private sale. Probably it would have, in that contingency, no validating effect. Authority, however, is not wanting that it would. It was so held in the case of Apel v. Kelsey, 52 Ark. 341, 12 S. W. 703, 20 Am. St. Rep. 183. The defense, it should be added, is without merit, other than such as belongs to any purely technical defense. Pirtle & Trabue, who had authority to examine the title, and to confer with complainant in regard to same,—as to what was necessary to be done by him in order to pass a good title,—indicated to complainant what they thought was thus necessary, and never intimated to him that a private sale would not do. On the contrary, after he had complied with their suggestion as to appraisement and confirmation of sale, they informed

him that he had done all that was necessary to be done. Mr. Stoll, who had executed the contract on defendant's part, and had been directed to see that it got a good title, and who was in charge of its legal affairs in Kentucky after July 1st, was aware, to complainant's knowledge, of the negotiations between Pirtle & Trabue and complainant, and their result, informed complainant that, if their opinion was satisfactory, he would be ready for settlement, and, again, that they and complainant might reach a conclusion as to what was necessary to be done, and did not until January 16, 1900, express a contrary opinion, or disapproval of their course. Mr. Stoll does testify that he was always of the opinion that complainant had no power to make a private sale, and that he so informed complainant when the contract was being drawn. This, however, is denied by complainant, who says that he expressed the opinion that he could make a private sale. But however this may be, complainant had a right to infer from his subsequent course either that he had changed his mind, or that defendant was willing to go ahead notwithstanding his opinion. And it is hardly natural that he would go ahead, with this opinion, without calling defendant's attention thereto, and receiving further direction from it, in view of the authority under which he executed the contract, which directed him to see that it got a good title.

(2) Again, it is claimed that such inability exists because there was no valid appraisement of the real estate covered by the contract prior to making of the contract. It is claimed that the law requires an appraisement to be had of real estate held by an assignee under a deed of assignment, before making a sale of same, either publicly or privately, and that the appraisement which was made was invalid, because it was an appraisement of both the real and personal estate sold, without a separate appraisement of the real estate, and because it was made after, and not before, the sale. This defense, like the former one as to the sale being a private one, is not meritorious. It is true that Pirtle & Trabue, in their letter of June 23d, took the position not only that the real estate should be appraised, but that it should have been appraised prior to entering into the contract, and that in their letter of August 2d to Mr. Stoll there is reference to this position, somewhat ambiguous. But complainant's testimony that as a result of his personal interview, on June 24th, Judge Pirtle agreed that an appraisement after the contract would do, is not denied by him. In the letter of Blanton & Berry to Pirtle & Trabue of August 19th, the former said to the latter that, if they still adhered to their former opinion as to the necessity of the appraisement prior to the sale, the only way this could be done was for the assignee to have the property appraised, and thereafter enter into another contract of sale with Mr. Stoll, and expressed a desire to hear from them as to this at their earliest convenience. And again, in the letter of Blanton & Berry to Pirtle & Trabue of August 21st, they repeated:

"If you think the appraisement should antedate the date of sale, the only thing we can do now is to enter into a new contract of sale as of a different date, subsequent to the appraisement."

A copy of the letter of August 19th, at least, was sent to Mr. Stoll. In answer to both letters, Pirtle & Trabue said:

"We think, after the order of confirmation of the sale has been entered at the August term of the court, that the objections heretofore made will be cured. We think we have expressed this opinion heretofore, when we stated that it would not be necessary to begin over again from the beginning in this matter."

A copy of this letter, no doubt, was sent to Mr. Stoll. In view of this, it does not come with good grace, if everything else should be all right, for defendant to urge a defective appraisement as a reason why its contract should not be enforced. If the fact that the appraisement included some personal estate rendered complainant unable to pass a good title to defendant, no objection could be urged to defendant's relying on this, as it does not seem to have seen the appraisement until after this litigation. But it would hardly be held, if an appraisement was necessary, that because it included some personal property, which was essential to the operation of the distillery and the carrying on of the business, and, with the real estate, constituted a distinct whole, the appraisement was so defective that complainant was unable to pass title to defendant after confirmation of the sale.

Was, then, an appraisement required? Defendant contends that it was, by the act of April 9, 1878, entitled "An act providing for the redemption of real estate sold under an order or judgment of a court" (1 Acts 1877–78, p. 122), re-enacted by Article 2 of the said act of February 25, 1893, entitled "An act concerning lands," heretofore referred to, and found in sections 2362, 2365, Ky. St. Section 2362 provides that "before any real estate shall be sold under an order or judgment of a court other than an execution, the commissioner or officer, whose duty it may be to sell the same, shall cause it to be valued" in the manner pointed out therein. Section 2363 provides that the valuation so made shall be in writing, signed by the persons making it, and returned by such commissioner or officer to the court which made the order or rendered the judgment for the sale of the property, and the same shall be filed among the papers of the cause in which the judgment was rendered or the order made, and also spread upon the records of the court. Section 2364 provides that, if the real estate which may be sold in pursuance of such judgment or order does not bring two-thirds of such valuation, the defendant and his representatives shall have the right to redeem the same within the time and in the manner therein provided. Section 2365 provides that, "if the judgment in pursuance of which such sale is made be not satisfied by such sale, the right of redemption herein provided for may be sold in satisfaction of the residue of such judgment; and the said right of redemption shall also be liable to sale under execution," with additional provision as to method of redemption in such case, and as to filing report of sale.

Now, it must be acknowledged that before the act of February 25, 1893, removing the bar to the assignee's making a sale of the assigned property without the assignor's written consent, in case of a sale by the assignee with the assignor's written consent, and after that act, and before the act of March 16, 1894, in case of a sale by the assignee alone, publicly or privately, this appraisement statute had no application, and no appraisement was essential. That for the reason that the sale was not under an order or judgment of a court, but

in pursuance of the deed of assignment, and the statutory permission of a sale by the assignee with the assignor's consent in the one instance, and without his consent in the other instance; that the assignee was not a commissioner or officer, the mere fact that by the act of March 8, 1876, he was required to execute a bond and file an inventory and report of sale being hardly sufficient to constitute him an officer; and that the sale was not had in an adversary proceeding between parties, and in which there were defendants. Such a sale was not within the purview of the act. The court of appeals of Kentucky held in the case of Woolridge v. Jacob's Guardian, 79 Ky. 350, that where real property was sold under judgment of court, for reinvestment of the proceeds, the sale, though within the letter of the statute, was not within the intent of the statute, and hence not affected by it. In the case of McKee v. Stein's Guardian, 91 Ky. 242, 16 S. W. 583, it was held that the statute did not apply to a resale of real property purchased by the defendant debtor to satisfy purchase price of first sale; and it was said that, if the purchaser at the first sale had been a stranger, a sale to satisfy the sale bonds would not be within the statute, because "he would not have been a defendant, in contemplation of the statute." On the other hand, in the case of Cantrill v. Perry's Adm'r, 7 Ky. Law Rep. 446, it was held that, where an administrator sued to subject the real estate of the decedent to the payment of debts, the act in question applied, and that a sale had therein could not be sustained, because the property had not been previously appraised. And in the case of Graves v. Association, 87 Ky. 441, 9 S. W. 297, that, in a suit brought in the circuit court for a settlement of an estate assigned for the benefit of creditors under provisions of sections 428–438 of the Civil Code of Practice, a sale in pursuance to a judgment therein was within this appraisement statute. In each of these two cases the sale was under a judgment of court, was by a commissioner of the court, was in an adversary proceeding to which there were defendants, was coercive, and was to pay debts.

There is no room for claiming that the act of March 16, 1894, made any change in the application of the appraisement statute to a sale of real property by the assignee under a voluntary deed of assignment. The sole effect it had upon such a sale was to require that it be in the same manner and upon the same terms as real property sold at decretal sale, and that it be reported to and confirmed by the county court, and perhaps, also, to cut off all power on part of the assignee to sell it under the deed of assignment after jurisdiction of the assigned estate had passed to the circuit court by the filing therein of a petition to settle that estate. The effect of the amendment of March 16, 1898, was to restore to the assignee the power to sell the real property privately whilst the county court had jurisdiction, and to confer upon the assignee the right to sell privately or publicly after jurisdiction had passed to the circuit court. The act of March 16, 1894, as amended by the act of March 16, 1898, expressly provides that the assignee, both whilst the county court has jurisdiction and after the circuit court has acquired jurisdiction, shall have the power not only to sell, but to convey to the purchaser the right and title of the assignee. The only connection which the county court, in the one instance, and the circuit

court, in the other, has with the sale, is simply supervisory, to confirm or reject it, and perhaps, also, in case of delay on the part of the assignee, to compel him, upon a proper showing, to act. In no event is his sale a sale under or in pursuance to the judgment of the court, but under and in pursuance of the deed of assignment. And there is no intimation anywhere that it was the intention of the legislature that the appraisement statute should apply to such a sale. It may be difficult to find any good reason why it applies to a sale of the assigned estate by a commissioner under a judgment of the circuit court rendered in a suit brought to settle the estate, pursuant to the Code provisions, before the amendment of March 16, 1898, and not to a sale by an assignee, under the supervision of that court, after that amendment was passed. Suffice it to say, the former sale comes within the letter of the appraisement statute, and the other does not, and there is no reason for holding that it was the intent of the legislature that a sale by an assignee, after jurisdiction had passed to the circuit court, should be governed by the appraisement statute, when it was not so governed if made before jurisdiction had so passed. But however this may be, this was the case of a sale by an assignee before jurisdiction had passed to the circuit court, and there has never been any ground for claiming that a sale so made was within the appraisement statute. It was not so before the act of February 25, 1893, when the assignor had to give his written consent thereto. It was not so after that act, when he had power to make a sale without consent. If so, there is nothing to indicate that it was intended that a sale after the act of March 16, 1894, which permitted him to sell without the assignor's consent, but required sale to be public or after the amendment of March 16, 1898, which permitted it to be private, should be within the appraisement statute. The court is therefore driven to the conclusion that no appraisement was required in this case. And even if one was necessary, it feels that the failure to have a proper appraisement was simply a ground of exception to the sale, and not a ground for holding that the sale, after confirmation, was void.

But if it be conceded that the law required an appraisement, and that it should have been made prior to the sale, and of the real estate alone, it does not follow that because the appraisement was made after the sale, and included the personalty connected with the operation of the distillery and the carrying on of its business, that there has been any flaw in complainant's title on this score since the confirmation of the sale. Counsel for defendant cites authorities to the effect that a failure to comply with a statutory requirement as to appraisement will invalidate the sale. But it will be found that most, if not all, of those authorities, are cases of sales by a sheriff under execution, whose sole authority to act depends upon statute, and whose action is not reported to a court, and subject to exception and confirmation. It would seem that in a case like this, where the statute requires the sale to be reported to the court, and permits exceptions to be taken to the sale for irregularities, and provides for confirmation, if valid exceptions are taken, a failure to except to a sale for want of an appraisement, or of a regular appraisement, by a party in interest, and confirmation of the sale by the court, put an end to any invalidity on this score. The fail-

ure to except to the sale on this ground by the parties in interest should be treated as a waiver of any irregularity in that particular. The object of requiring the report to be made and to lie over until the second regular term of the county court, and of conferring on the parties in interest the right to except, is in order that such and like irregularities may be corrected, and failure to except to the sale on such ground amounts to a consent that the same may be confirmed notwithstanding them. In the case of Anderson v. Briscoe, 12 Bush, 344, it was held that the failure of a sheriff to have property sold under execution properly appraised may be waived. Judge Lindsay said:

"As the life estate of Gray was subject to levy and sale, the next question for consideration is whether the mistake of the appraisers in valuing the fee simple, instead of the life estate of the debtor, renders the sale absolutely void. The provisions of the statute concerning the sales of land under execution, requiring them to be advertised, the lands to be valued, and the officer to return the valuation with the execution, and to refer to and explain the proceedings, are not so mandatory that a failure to observe them literally will necessarily render the sale void and of no effect. The valuation is for the benefit of the defendant, and to secure to him the legal right to redeem in case the estate should not sell for two-thirds of its value. This legal right may be waived, at the election of the defendant; and, if he chooses to waive it, the purchaser cannot, on account thereof, avoid his purchase, as he might undoubtedly do if the sale was null and void."

There is nothing in the cases of Cantrill v. Perry's Adm'r and Graves v. Association, supra, to the contrary. In each case exceptions were filed to the report of sale before it was confirmed, and the sale was set aside on these exceptions. And in the case of Cantrill v. Perry's Adm'r it was held that the heirs of the deceased debtor could not affect the right of the creditors of the decedent to except to the sale because of irregularity in the matter of appraisement by any contract on their part. In neither case was there any question as to the right of anybody to complain of the sale after its confirmation because of any such irregularity.

(3) A third reason for defendant's position as to complainant's inability to perform is that the deed of assignment from T. J. Megibben Company to complainant did not pass the title. That deed was executed on behalf of said company by its president, J. W. Megibben, and recited that it was insolvent and unable to pay its debts in full, and that at a meeting of its board of directors, at which all were present, a resolution was adopted reciting that it was to the best interests of said company and its creditors that a deed of assignment be made, and directing its said president to execute and deliver such a deed to complainant. The ground upon which it contended that said deed of assignment so executed did not pass the title is that by the articles of incorporation of said company it was provided that the board of directors or officers could not sell, mortgage, or otherwise dispose of any real estate belonging to the corporation unless authority therefor was first given by a vote of a majority of the stock, and that there is no admissible evidence in the record of a meeting of the stockholders at which any authority was given for the execution of the deed of assignment, and such evidence as there was shows that there was not a majority of the stock represented. It is shown conclusively that the

record book of the company, containing minutes of the meetings of the stockholders and directors, is lost; and the sole evidence of what took place at the meeting is the testimony of the complainant, who was present, but who had no connection with the company. It is urged that this is not admissible evidence, especially as the testimony of the officers of the company as to what took place was obtainable. The point is not well taken. In McKelvey, Ev. p. 344, it is said:

"There is a distinction between proving a fact which has been described in a writing, and proving the writing itself. Because a fact has been described in a writing does not exclude other proof of the fact. For example, the proceedings of a corporate meeting of stockholders or directors are facts. They are ordinarily reduced to writing in the minutes of the meeting. Yet they may still be proved by independent oral testimony. But suppose the dispute be as to the minutes themselves; then the writing becomes the best evidence of what the minutes are, and must be produced."

In this case the minutes were lost, and much more so, therefore, was oral testimony admissible as to the proceedings had at the meeting. We are aware of no rule which requires a preference between those present at the meeting, as to who shall prove what took place.

Then as to the point that the testimony of complainant shows that a majority of the stock was not represented at that meeting: It shows that 334 shares were represented there by E. J. Megibben, 158 by J. W. Megibben, and 8 by P. R. Megibben; making, in all, 500 shares, which complainant claims was the entire stock of said company, so represented. Defendant contends, however, that the shares represented by E. J. Megibben and J. W. Megibben were not owned by them, but by Lewis Lebus, and he was not present at the meeting, and E. J. Megibben and J. W. Megibben were not acting for him. It contends, further, that in addition to this stock there were 500 more shares of stock in said company held by the estate of T. J. Megibben, which was not represented at said meeting. If either position is correct, then it is true that a majority of the stock did not take part in the meeting which authorized the making of the deed of assignment. But inasmuch as these two contentions of defendant arise in connection with another aspect of the defense of inability to perform on complainant's part, the determination of their validity will be deferred until we come to consider that aspect thereof. Assume, however, that a majority of the stock was not represented at that meeting, and that the making of the deed of assignment was without the authority of the stockholders; does this render the deed of complainant's assignor, admittedly an insolvent corporation, executed on its behalf by its president in pursuance to authority of the board of directors, ineffectual to pass the title to complainant? The authority of the board of directors of a corporation to make an assignment for the benefit of creditors is thus stated by 3 Thomp. Corp. § 3986:

"There is much authority for the view that the directors of an insolvent corporation may, without the consent of the stockholders, make an assignment in good faith of all its assets to a trustee for the payment of its creditors, though, as the exercise of this power generally has the effect of putting an end to the corporation, its existence is denied by some courts. And clearly the directors have no such power where the governing statute prescribes a different mode for winding up the affairs of the corporation and liquidating its debts. The statutory mode is exclusive. The reason is that the statute

forms a part of the security of the public, and one of the conditions upon which corporations subject thereto take their chartered powers."

Such being the law as to the right of the board of directors to authorize an assignment for the benefit of creditors, in view of the provisions in the articles of incorporation of the T. J. Megibben Company there may be some question as to the authority of its board of directors to authorize the deed of assignment made to complainant. But it is unnecessary to determine this question. The same work (volume 5, § 6473) states the law in relation to such assignments in another particular to be as follows, to wit:

"It is scarcely necessary to add that such an assignment, even if made without original power on the part of the directors, would be validated by the subsequent assent or acquiescence of the stockholders, and, on the other hand, that a stockholder may be precluded by his laches from questioning such an assignment."

The assignment in question herein was made nearly four years ago, —July 1, 1898,—and since then much has been done by complainant, outside of the making of the contract of sale involved herein, towards winding up the estate which has passed into his hands under the deed of assignment. It is stated somewhere in the testimony that as much as $160,000 has passed through his hands. Lewis Lebus, who, as defendant contends, is the owner of the stock represented by E. J. Megibben and J. W. Megibben at said meeting, is a defendant to this suit, and is seeking herein to have the lien which he holds on the property covered by the contract satisfied out of the moneys to be paid by defendant, if it is enforced by the decree herein. E. J. Megibben, J. W. Megibben, and P. R. Megibben, who were at said meeting and authorized said sale, are the widow and two of the heirs at law of T. J. Megibben, to whose estate it is claimed that the alleged additional 500 shares belong. No stockholder, so far as this record shows, has ever raised his hand against the assignment, and it is certainly too late for him now to do so. It must be adjudged, therefore, that this point is not well taken.

(4) A fourth reason for claiming that inability to perform on complainant's part exists is that such title as the T. J. Megibben Company had to the premises was acquired from T. J. Megibben by deed made 7th day of December, 1888, and the title of T. J. Megibben thereto was defective. T. J. Megibben claimed title thereto under deeds from the heirs of John Lail, Sr. He had ten children, and, at the time he claimed to have acquired title, two of these, to wit, Nancy Bell and George Lail, were dead, each leaving seven children. The deeds filed as exhibits in this case from the heirs of John Lail, Sr., to said T. J. Megibben, range in date from 1857 to 1863; and they cover the entire interests of those heirs, except several of the individual one-seventh interests of the children of Nancy Bell and George Lail. It is conceded that, at the time the contract in suit herein was made, there were no deeds of record for said interests. But immediately after the making of said contract, in April and May, 1899, before the abstract of title was delivered in pursuance to the contract, deeds were obtained for said interests from the proper parties, and put to record. The obtention of these deeds is what delayed delivery of

abstract, and they were the deeds which Pirtle & Trabue, in their letter of June 23d, insisted should be stamped. Of the children of Nancy Bell, there was a married daughter, named Sarah Righter, who made a deed to said T. J. Megibben for her interest October 1, 1862. Her husband did not unite with her, and hence her deeds passed no title. To cure this defect, she made a quitclaim deed for her interest in February, 1901, she being then a widow. These deeds seem to cover the entire interests of the heirs of John Lail, Sr., in the land. If any interest is not covered by them, it has not been pointed out by counsel. They quote from the deposition of complainant the statement that:

"Some of the heirs of the former owner of this property have never conveyed their interest to Mr. Megibben. * * * We subsequently secured the release of all the heirs of old man Lail, except possibly 1/70 part of the undivided interest in the property."

It is this possible 1/70 interest, if any, that is not covered by the recorded deeds, but we have been unable to make out that there is an outstanding 1/70 interest that has not been conveyed. And however this may be, the evidence in the cause establishes beyond question that T. J. Megibben, T. J. Megibben Company, and complainant have been in the exclusive, continuous, open, and adverse possession of the real estate covered by the contract of sale herein for a period of well-nigh 50 years; and this possession is sufficient to bar any outstanding 1/70 interest, and was sufficient for that purpose, as to the interests covered by the deeds obtained after the making of the contract of sale herein, so that the obtaining thereof was really a matter of extra precaution. The court must conclude that there is no inability to perform in this particular.

(5) A fifth reason for claiming inability to perform on complainant's part, urged, is that there are on the distillery premises a mortgage and attachment lien for $23,000 in favor of Lewis Lebus, a mechanic's lien for $809.03 in favor of J. T. Megibben, and a similar lien for $3,154.89 in favor of P. R. Megibben, and a lien for $—— in favor of R. E. Hall. This is undoubtedly true. But this does not render complainant unable to pass a title to defendant clear of said liens. They are parties defendant to this action, and provision can be made in the decree for paying and discharging them out of the money coming to complainant. This will but be carrying out the suggestion of Pirtle & Trabue in their letter of June 23d, pointing out what was necessary to be done in order to clear up the title,— that an agreement might be made whereby the lien creditors referred to would release their respective liens, and look to the proceeds in complainant's hands for payment.

(6) A sixth reason is that there is a lien on the property for state and county taxes for the year 1900. It was developed in the testimony in the cause that the taxes for the year 1899 had not been paid by complainant before the bringing of this suit, because of a failure to assess the property in 1898, after the deed of assignment had been made. But since then the property has been assessed and the taxes paid. As to the taxes for the year 1900 due on the assessment made September 15, 1899, it would seem that defendant is

bound to pay them. At that time defendant was the equitable owner of the property, and by section 4023, Ky. St., it is provided:

"The holder of the legal title, and the holder of the equitable title, and the claimant or bailee in possession of the property on the fifteenth of September of the year the assessment is made, shall be liable for the taxes thereon, but, as between themselves, it shall be the duty of the holder of the equitable title to list the property and pay the taxes thereon, whether the property be in possession, or not, at the time of the payment."

But even if complainant were bound to pay said year's tax, provision can be made for its payment out of the purchase price, as in the case of the other liens, and the lien removed from the property in this way.

(7) A seventh reason is that the defendant will become liable for all state and county taxes assessed against the whisky contained in the bonded warehouse since its manufacture, upon the removal thereof from the warehouse, without right to obtain from the owners of the whisky so removed funds to meet such liability, unless, by the terms of the warehouse receipts issued for same, such taxes can be collected from such owners, and that there is a large quantity of whisky in said warehouse, the taxes on which cannot be so collected. It is not made clear whether it is thought that this liability will be a mere personal one on defendant's part, by virtue of its ownership of the distillery premises and warehouse, or whether that property itself is, and will continue to be, subject to a lien therefor. This liability is deduced from the peculiar method of assessing whisky in bonded warehouse, and collecting the taxes thereon. The revenue laws of Kentucky provide for the annual assessment of whisky in bonded warehouse as of September 15th in each year, by a state board of valuation and assessment, and for payment of the taxes due thereon for all the years it has been assessed, when taken out of bond, and, further, that on the 1st day of January, May, or September next after the whisky has been removed from the warehouse, the owner or proprietor of the bonded warehouse shall report to the auditor of public accounts and the clerk of the county court the quantity of spirits removed from the warehouse during the preceding four months, and certain other information, and shall at the same time pay all taxes and interest due the state, county, taxing district, city, or town, to the officer entitled to receive the same. Because of this statutory provision, it is claimed that the defendant, as owner and proprietor of the bonded warehouse on the premises in question, upon the completion of its purchase will become bound to pay all state and county taxes assessed against the whisky contained in said warehouse since its manufacture, within four months after its removal therefrom. Is this true, and, if so, will it, or not, have the right to collect such taxes from the owners of the whisky, whatever may be the terms of the warehouse receipts? It is given by defendant as a reason why it is important to it that the stipulation in complainant's contract that he should procure for and deliver to it 90 per cent. of the capital stock of his assignor, the T. J. Megibben Company, and the resignation of its board of directors and officers should be performed, notwithstanding said corporation is now without assets of any kind or de-

scription, and is practically an exhausted corporation, that the United States government will not permit the defendant, or anybody else than the original distiller, or complainant, its legal representative, to remove the whisky from bond; and it desires to be in a position so that it can, by obtaining and keeping up the organization of the defunct corporation, through it, facilitate the removal of whisky from said warehouse. It does not want to be dependent upon complainant. The good will of the concern is interested in the owners of whisky in said warehouse being able to remove their whiskies promptly. If such is the case, it is difficult to understand how the defendant or its property would become liable for the state and county taxes, notwithstanding the phraseology of the statute. That phraseology must mean that the liability is affixed to such person as is recognized by the United States government, as the owner and proprietor, and has a right to remove the whisky and turn it over to the owner thereof. If removed by complainant, then he is the owner or proprietor referred to by the statute; if removed by the defunct corporation, then it, notwithstanding it has no assets out of which such a liability could be enforced. But even if such liability would be affixed to defendant in case its contract is enforced herein, it will be in a position to obtain funds from the owners of the whisky with which to meet it. The state and county have each a lien on the whisky in the bonded warehouse in question for all taxes due them, respectively. This is by virtue of section 4021 of the Kentucky Statutes, which provides that:

"The commonwealth and each county * * * shall have a lien on the property assessed for the taxes due them respectively, which shall not be defeated by gift, devise, sale, alienation, or any means whatever, unless the gift, devise, sale or alienation shall have been made for more than five years before the institution of proceedings to enforce the lien."

And by section 4109, Ky. St.,—one of the sections of article 5 of the chapter on "Revenue and Taxation,"—in relation to "assessment of distilled spirits," it is provided as follows:

"Any person or corporation having the custody of such spirits on the fifteenth day of September in the year the assessment is made, shall be liable for all taxes due thereon, together with all interest and penalties which may accrue; and any warehouse-man or custodian of such spirits, who shall pay the taxes, interest or penalties on such spirits, shall have a lien thereon for the amount so paid, with legal interest from the date of payment."

If this section does not indicate an intent that the warehouseman who is made liable for the taxes is the warehouseman at the time the assessment was made, it certainly does indicate an intention that the warehouseman, who is bound to pay the taxes and does so, shall have a lien on the spirits for them. So we see that the state and county both have liens on the whisky in the warehouse in question, to secure the taxes assessed in their favor, respectively; and if defendant should become bound to pay them, by reason of the acquisition of the title to the bonded warehouse, it has a lien on them, also, for the amount it may have to pay. Its right to this lien will in no way be affected by the warehouse receipts which have been issued by the T. J. Megibben Company, no matter what the terms of those receipts may be. It never issued them, and is no party to them, and

is not bound by them to any extent. The holder will have to look to the T. J. Megibben Company and complainant for a compliance with the terms. But though this is so, it was expressly provided in the contract sought to be enforced herein, in clause 2 thereof, that all taxes assessed against the whisky in the bonded warehouse, except the taxes assessed by the United States, shall either be paid at the time of delivery of the said deed, or sufficient funds shall be preserved in the hands of the first party to pay same from time to time, as the whisky is taken out of bond, except to the extent that such taxes can be collected by the said second party under the terms of the warehouse receipts which have been issued for the whisky in said bonded warehouse, and that, though defendant may not be bound to pay these taxes, it can be urged that he is entitled to have this stipulation carried out, as it is to its interest, for the good will of the business, that the terms of the warehouse receipts issued be carried out to the letter in this particular. Granting that this is so, there is nothing in this in the way of complainant's right to a specific performance. He is not bound to pay those taxes when the deed is delivered. If he does not do so, the contract is that he will reserve sufficient funds to pay them from time to time, as the whisky is taken out of bond. This is purely a personal contract on the part of complainant, and, as defendant was satisfied with it when the contract was made, he can ask no more now.

(8) An eighth reason is that there were in the bonded warehouse, at the time performance was tendered, about 7,500 barrels of whisky, the United States government tax upon which amounted to as much as $330,000, and that there must still be a large amount of whisky stored there, upon which a very large tax is due the United States government. This tax is primarily a lien on the whisky, but, if the whisky is not sufficient to meet it, the distillery premises are liable therefor. Defendant apprehends danger from this source for two reasons: The evidence discloses that J. W. Megibben, president of the T. J. Megibben Company, before the assignment, had issued duplicate, and even triplicate, warehouse receipts for whisky in the bonded warehouse, and had removed from it whisky for which warehouse receipts had been issued, without the consent of the holders thereof, and had thus rendered himself liable to criminal prosecution. It is suggested that in order to take away evidence of the absence of the whisky removed, and protect himself from conviction for its removal, J. W. Megibben may cause the bonded warehouse and its contents to be destroyed by fire, and in this way the government lien may be thrown upon the distillery premises. This is so improbable, as shown by defendant's own presentation of the matter, that no heed need be given to it. The other ground for such apprehension is that what is termed the "outages" from the whisky remaining in the bonded warehouse may be so greatly in excess of what is allowed by the government that what is left may not be sufficient to pay the tax, so that the lien on the distillery premises may have been enforced to make up the deficiency. It does not seem to the court that the evidence in the record warrants such a conclusion. The defendant does not seem to have apprehended much danger from this source when the contract was made, for it then knew, through its agent, Mr. Stoll, who drafted the contract and

executed it on its behalf, of the former fraudulent practices of J. W. Megibben, out of which defendant's present apprehensions principally grow, and no provision was inserted in the contract in view of it. On the contrary, it was recognized by clause 2 of the contract that the taxes on the whisky assessed by the United States were not to be paid by the complainant, and the lien therefor on the distillery premises was to remain. It is true that in the same connection it was stipulated that the property sold should, at the time of the delivery of the deeds, be free and clear from all liens, charges, and incumbrances, taxes and assessments, whatsoever. But this was not intended to include the lien of the United States for taxes assessed on the whisky, as is shown by the fact that, in providing for the payment or retention of funds to meet the taxes on the whisky, those due the United States are expressly excepted from the provision. Counsel would have it that the stipulation as to freeing the property sold from liens requires the complainant either to pay or give security for the United States taxes on the whisky, estimated to amount to as much as $330,000, or to export the entire whisky to a foreign country before he can have specific performance, in the face of the express provision that said taxes are not to be paid, or sufficient funds retained by complainant to meet them. The court cannot accede to this contention.

(9) A final reason for claiming inability on complainant's part to perform its part of the contract is that complainant is not supplied with 90 per cent. of the capital stock of the T. J. Megibben Company to deliver to defendant upon the execution of the contract. The ground upon which this claim is based has been theretofore referred to. It is, in brief, that the 492 shares which complainant claims to have, obtained from E. J. Megibben and J. W. Megibben, belong to Lewis Lebus, and not to them, and the total number of shares in said company is 1,000, instead of 500, as claimed by complainant. As to the 492 shares, the evidence shows that certificates therefor were issued to E. J. Megibben and J. W. Megibben March 1, 1892,—334 to one, and 158 to the other; that thereafter those certificates were transferred to Lewis Lebus as collateral security for debt; and that on February 1, 1900, he delivered to E. J. Megibben and J. W. Megibben a paper reciting that he had surrendered said certificate to them; that the transfer of them to him was null and void; and that they were owned by them, respectively. It is not necessary to consider in detail the grounds upon which it is claimed that, notwithstanding these facts, said certificates belong to Lewis Lebus. Suffice to say that the court does not think them well taken. So far as the point made that the paper so delivered by said Lewis Lebus should be stamped is concerned, that objection, if valid, can be met by stamping them, which can be provided for in the decree. In regard to the claim that the total number of shares of stock which have been issued by said company are 1,000, instead of 500, as claimed by complainant, there is this to be said: The sole evidence for the issuing of 500 shares in addition to the 500, as claimed by complainant, is the statement on the stub of the stock certificate book that on March 1, 1892, a certificate was issued for 500 shares to the estate of T. J. Megibben. But the same stub that contains that statement contains the additional statement that

the certificate had been canceled.    It is questionable, to say the least, whether a certificate issued to the "estate" of a dead person can be said to have been issued at all.   Besides this, there are various evidences in the record which show that the stock of said company was only $50,000.   The contention in regard to inability to perform as to the stock is not well taken.   This disposes of every ground upon which it is claimed that complainant should be denied the relief he seeks because of inability to perform on his part.

2. Another defense relied on to defeat complainant's effort to obtain specific peformance herein is that complainant did not make a good tender of performance of his part of the contract before he brought suit.   It is conceded that he made a certain tender to Mr. Bradley, the defendant's assistant treasurer, and chief official in Kentucky, at its Frankfort office,. on February 2, 1900, before the suit was brought; but it is contended that that tender was not good, and that in several particulars.   It was not made within the time stipulated in the contract, and time was of its essence.   The deed tendered recited that, under the contract, complainant was entitled to $39,000, without any guaranty as to the storage claims to be transferred, and transferred them without any such guaranty, when the contract provided that, to entitle complainant to that much; he should guaranty the storage to amount to as much as $3,600.   And no tender was made of the resignation of the directors, and the stock tendered did not amount to 90 per cent. of the entire capital stock.   What, if any, tender was complainant bound to make, and when was he to make it? The contract provided, it is true, that the complainant should, within 10 days after approval of the sale by the Harrison county court, "execute and deliver" to the defendant, "at its office in the city of Louisville, Kentucky, deeds in accordance with the terms of the agreement, upon a day to be designated by him, notice of which should be given to defendant, or to Charles H. Stoll, at the Columbia Building, in the city of Louisville, Kentucky, three days before the time of delivery of said deeds."   But this provision as to time and place of delivery was subsequently waived by defendant, through its attorneys, who had full charge of the matter.   In Mr. Stoll's letter to complainant of July 31st, he stated that, if Pirtle & Trabue's opinion as to the title should be satisfactory, a deed would be prepared, and he would be ready for settlement with complainant, and that it would not be necessary for him to leave home, as arrangements would be made to settle there upon the execution of the deed.   In Pirtle & Trabue's letter of August 30th, expressing satisfaction with what had been done by complainant in the county court, they stated that they would at once prepare a deed, and send it to Mr. Stoll for his approval, with the request that upon approving it he forward it to complainant for execution, and he would then arrange for the delivery of the deed and the payment of the money.   Thus it was that the place of delivery was changed to complainant's home, at Cynthiana, and the time to be arranged by Mr. Stoll.   In view of this, it is hardly to be contended that it was complainant's duty to tender performance to defendant at Louisville within 10 days from August 28th, the date of the approval of the sale by the county court, or at any time or place, until de-

fendant should be heard from further. And defendant's counsel do not so contend with any degree of earnestness. They insist, however, that it was complainant's duty, within 10 days after the receipt of Mr. Mayer's letter of the 18th of December, notifying complainant that his title could not be accepted, or at the very farthest within 10 days after Mr. Stoll's notification to the same effect on January 16th, to tender performance at Louisville, first giving three days' notice thereof. Certainly the notification from defendant from these sources had no such effect, but, as we shall show presently, an entirely different one; and, if tender of performance was necessary at all, the tender at Frankfort on February 2d was sufficient, so far as time, place, and notice were concerned. It seems to the court, though, that at no time or place before suit brought was it necessary for complainant to tender defendant deeds for the property agreed to be conveyed and transferred, and that for two good and sufficient reasons: .

One is that the contract expressly provided that the division of the consideration for all the property between the two deeds was to be made by defendant, and the deeds were to be drawn according to forms prepared by defendant. In other words, the deeds to be executed and delivered by complainant were to be prepared by defendant. It follows from this that it was impossible for complainant to comply with his contract in regard to execution and delivery of deeds without defendant's taking the initiative, and tendering him the deeds to be executed and delivered by him. Complainant's execution and delivery of deeds was necessarily conditional upon their preparation and delivery by defendant to complainant, to be executed by him. He could not have been sued by defendant for their nonexecution and delivery without previous preparation and tender of them to him by defendant for execution. Langdell's Summary of the Law of Contracts, § 41, says:

"A covenant or promise which cannot be performed, except upon the happening of a certain event, is necessarily conditional upon the happening of that event, and the condition may be said to be implied in fact. The necessity for making the implication may be found either in the language of the covenant or promise, or in its subject."

In Ranay v. Alexander, Yel. 76, it was held that the defendant's promise, being to deliver to plaintiff 15 tods of wool, to be chosen by the plaintiff out of 17 tods in defendant's possession, was necessarily conditional upon plaintiff's making the selection. In Coombe v. Greene, 11 Mees. & W. 480, it was held that the defendant's covenant, being to lay out £100 under the direction or with the approbation of some competent surveyor, to be named by plaintiff, could not possibly be performed until the plaintiff named a surveyor. In Rae v. Hackett, 12 Mees. & W. 724, defendant's promise was that a certain ship should sail and proceed in ballast to a safe and convenient port near Cape Town. It was held that, as the voyage was to be made on plaintiff's account, it necessarily followed that the port was to be selected by the plaintiff, and not by the defendant, and as the vessel could not sail direct to a port selected by the plaintiff, near to Cape Town, unless the port was selected and notice of it given to the defendant before the vessel sailed, it necessarily followed that the

selecting of a port by the plaintiff, and giving notice of it to the defendant, was a condition precedent to the vessel's sailing. In the case of Armitage v. Insole, 14 Q. B. 728, it was held that the defendant's promise, being to give the plaintiff yearly 20 tons of coal, to be put free on board ship at Cardiff for the use of plaintiff, could not be performed until a ship was provided by the plaintiff, and the notice of it given to the defendant. In the case of Ellen v. Topp, 6 Exch. 424, the defendant covenanted that a certain apprentice should serve the plaintiff as an apprentice to the trade, which he was to be taught, namely that of an auctioneer, appraiser, and corn factor. It was held that the apprentice could not so serve unless the plaintiff continued to follow that trade, and the whole of it, and that hence the following of that trade by the plaintiff was a condition precedent to the defendant's obligation that the apprentice should serve.

And on the other hand, complainant had the right to sue the defendant for noncompliance with its contract after the expiration of the 10 days, without tendering the deeds. An authority expressly in point is the case of Poole v. Hill, 6 Mees. & W. 835. That was a suit at law by a vendor against the purchaser to recover damages for his failure to comply with his contract. In England where this case arose and was decided, the presumption is that the deed of conveyance is to be prepared by the buyer, and tendered to the seller for execution, —the same thing which was a matter of express stipulation in this case. The declaration did not allege that the plaintiff had tendered a conveyance to the defendant. It did allege a readiness and willingness to make a deed of conveyance. On demurrer to the declaration, it was held to be good. Lord Abinger said:

"On a contract for the sale of lands, unless it be expressly stipulated otherwise, the conveyance is to be at the expense of, and to be prepared by, the purchaser. Here it was for the purchaser to make out the conveyance in the usual course. That being done, his agreement is, on a given day, to pay the purchase money; and the plaintiff's, to execute the conveyance and complete the title. The defendant could not have maintained an action for the noncompletion of the purchase without averring that he had tendered a conveyance. He was to perform the initiative before the plaintiff could be called upon to offer a conveyance, and the plaintiff was not bound to execute a conveyance until the defendant had prepared and tendered it for execution. The declaration is, therefore, good, and the judgment will be for the plaintiff."

The correctness of this position was presupposed by Mr. Justice Story in the case of Taylor v. Longworth, 14 Pet. 172, 10 L. Ed. 405. He there said:

"Now, the plain import of the words of his [vendor's] contract is that he will make the deed. The excuse for the omission is that it was the duty of the other side to prepare and tender a formal deed to him for execution. And authorities are relied on, principally from the English courts, to show that in all cases of this sort the established rule is that the vendee shall prepare and tender the conveyance. This is certainly the rule in England,— founded, doubtless, upon the general understanding and practice among conveyancers, as well as upon the peculiar circumstances attendant upon conveyances in that country. The same rule does not seem to have been adopted generally in America, although it may be adopted in some states. In Ohio the rule as stated by the learned judge who decided the present case ought not to prevail, and the local practice in a case of this sort ought certainly to constitute the proper guide in the interpretation of the terms of the contract."

The cases of Kelsey v. Crowther, 162 U. S. 404, 16 Sup. Ct. 808, 40 L. Ed. 1017, and Kentucky Distilleries & Warehouse Co. v. Warwick Co., 48 C. C. A. 363, 109 Fed. 280, are not contra here. In this case, complainant's contract to execute and deliver deeds to defendant could not be performed without a preparation and delivery by defendant, first, of the deeds to be executed by complainant, because the deeds which he was to execute were the deeds which defendant was to prepare for him. There the delivery of the abstracts of title by the vendors was not an event which it was necessary should happen in order that the purchasers might comply with their promise to pay the money.

The other reason why the complainant was not bound to tender deeds before suit brought was the fact that before then the defendant had set complainant at defiance by notifying him that it would not accept his title. This it did by the letters of Mr. Mayer, beginning with that of December 18th, and by the personal interview with Mr. Stoll on January 16, 1900, at Lexington. Defendant would have it that the contents of these letters and the statements of Mr. Stoll in this interview did not amount to an absolute refusal on its part to comply with its contract, but only a qualified refusal, i. e., unless the complainant cured the defects in its title, it would not accept it, and that it desired to inform complainant what the defects were, in order that he might cure them, and he would not permit Mr. Stoll to do so. But there was no intimation to complainant that the defects which it claimed in the title could be cured by him. Nor is there any such intimation now. On the contrary, the contention now is that they are incurable, and that such was defendant's view of the matter was the reasonable deduction to be drawn from Mr. Mayer's letter and Mr. Stoll's statements. Indeed, the only defect which Mr. Stoll succeeded in conveying to complainant, according to his account of the interview on January 16th, if acceded to, meant an end to the contract of sale between complainant and defendant. That was the fact that the property had not been appraised prior to the making of that contract. In order to cure this defect, if it was a defect, it would have been necessary to have set that contract aside, and had a resale, so that an appraisement could be had before it; and, upon the contract being set aside, it would have been entirely with defendant whether it would have entered into another contract with complainant. So no other interpretation can be put upon defendant's statements, written or oral, through its attorneys, than that they amounted to an absolute refusal to comply with their contract. That being the case, it is well settled that complainant was relieved from any tender of performance on his part before suit brought. In the case of Moore v. Crawford, 130 U. S. 122, 9 Sup. Ct. 447, 32 L. Ed. 878, suit for specific performance was brought by vendee against the vendor of a contract of sale for an undivided one-sixth interest in certain land in consideration of $10 cash and $240 to be paid subsequently. Mr. Chief Justice Fuller said:

"It is true there is no offer to pay the balance of the purchase money, but the case shows that a tender would have been but an empty show; and as the court had it in its power to require payment of the $240 note, thus completing performance by Moore, and as it did this by its decree, the allegation would have been merely formal, and became immaterial."

And in the case of Cheney v. Libby, 134 U. S. 68, 10 Sup. Ct. 498, 33 L. Ed. 818, Mr. Justice Harlan said:

"A party filing a bill submits to do everything that is required by him; and the practice of the court is not to require the party to make the formal tender, where, as in this case, from the facts stated in the bill, or from the evidence, it appears that the tender would have been a mere form, and that the party to whom it was made would have refused to accept the money."

No tender at all, therefore, being necessary before suit brought, it is entirely immaterial that the tender which was made was defective. The stipulation in the deed which was tendered to Mr. Bradley that it was without guaranty of storage, of course, rendered the tender defective, because the contract of sale provided that, in the event complainant demanded $4,000 for the storage claims, he should guaranty them to amount to as much as $3,600. But it was purely a mistake that the deed contained such a stipulation, it being intended to conform to the requirement of the contract in the matter of the guaranty as to storage. And such a mistake is not sufficient to deprive a party of his right to specific performance, even where a tender is essential. In the case of Willard v. Tayloe, 8 Wall. 557, 19 L. Ed. 501, the contract sought to be specifically performed therein, according to the construction put upon it by the supreme court of the United States, required the purchaser to pay the purchase price in gold. He tendered greenbacks at a time when they were much depreciated. It was held that he was entitled to specific performance, notwithstanding the defective tender, and would be acquired by the decree to pay gold. Mr. Justice Field said:

"The kind of currency which the complainant offered is only important in considering the good faith of his conduct. A party does not forfeit his rights to the interposition of a court of equity to enforce specific performance of a contract if he seasonably and in good faith offers to comply and continues ready to comply with its stipulations on his part, although he may err in estimating the extent of his obligation. It is only in courts of law that literal and exact performance is required."

As to the claim that the tender was defective for failure to tender 90 per cent. of the stock of said company, it is not denied that the complainant tendered 492 shares of stock under the title of E. J. and J. W. Megibben. The sole claim is that this stock did not belong to them, but to Lewis Lebus, and that, because of the existence of 500 shares of stock belonging to the estate of T. J. Megibben, it was not 90 per cent. of the entire capital stock. This claim has been heretofore disposed of, so that the tender was not defective in this particular. But as to the resignations of the directors, it is conceded that they were not tendered at that time, and that they were not even procured until after this suit was brought. It is doubtful, to say the least, whether the contract required that the resignations of the directors should be procured before the making of the deed and payment of the purchase price. Clause 10 provided that certificates for 90 per cent. of the stock, and the resignations of the directors, should be delivered "along with said distillery property,"—phraseology which is somewhat indefinite. It is further provided that complainant should cause a meeting of the board of directors to be held to receive the resignations, and install a new board, and that at such time as the defendant might

indicate. There is room to hold that it was not contemplated that the resignations should be procured at any time before the time which defendant should so indicate, and therefore that it was not necessary to tender them with the deed. It may be said, however, that, though it may not have been necessary for complainant to have made a tender before suit brought, it was necessary that he should have been able and willing to comply with his contract at the time suit was brought, and that he was not able then to do so, however willing in certain particulars, as to which there can be no question. However this may be, in a suit at law, where no tender is necessary before bringing suit, it is not an invariable rule in equity in suits for specific performance. Ability to perform at any time before decree is often sufficient in such suits. The only particulars in which it can be claimed, in view of what we have already held, that inability to perform on complainant's part existed when suit was brought are in the matter of Sarah Righter's, and the possible $1/70$ interest in the property and possibly, also, of the resignations of the directors, and it is not necessary to cite authorities to show that such slight inability is sufficient to defeat complainant's right to specific performance.

We therefore conclude that the defense of failure to make a proper tender of performance before suit brought, and possible slight inability to perform at that time, is not sustained.

3. Again, defendant urges that complainant is not entitled to a specific performance of the contract of sale herein, because of want of mutuality in it. This want of mutuality is not in matter of obligation, but in matter of remedy. The contract on complainant's part was, as we have seen, not only to convey to defendant, by general warranty deed, an unincumbered fee-simple title to the distillery plant and personal property referred to, but to procure and deliver to defendant, at the time of the delivery of the deed, 90 per cent. of the capital stock of complainant's assignor, the T. J. Megibben Company, and the resignation of its board of directors. This latter part of complainant's contract it was not within his power to comply with when the contract was made, as the stock and resignations had to be procured from the parties who held the stock and offices, and could not be obtained from them without their consent. Defendant therefore could not enforce specific performance of this part of complainant's contract, and it contends that as it is a principle of equity jurisprudence that equality is equity, and, as it could not have specific performance of the entire contract on complainant's part, complainant is not entitled to specific performance of defendant's part of the contract. This position assumes, for the sake of the argument, that complainant has procured the stock and resignations, and has made a proper tender thereof, and claims that, from the mere fact of this original want of mutuality in the matter of remedy, the contract is not specifically enforceable on complainant's part. It merits careful consideration on our part. It is undoubtedly laid down as a general rule that contracts are not specifically enforceable unless they are mutual in the matter of obligation and remedy, both. The books, however, recognize numerous exceptions to the rule, and it is quite difficult to understand the exact extent and limitations of the doctrine of mutuality in specific performance of con-

tracts. Mr. Pomeroy, in his work on Specific Performance of Contracts, p. 237, says:

"I think it very clear that the rule was applied with much more strictness and severity in the older than in the later decisions. Indeed, the rule, so far as it relates to the mutuality of the remedy alone, is evidently based upon no principles of abstract right and justice, but, at most, upon notions of expediency; and the arguments in its support are often mere repetitions of time-honored verbal formulas, which, when closely analyzed, are found to have little or no real force or meaning."

Mr. Parsons, in his work on Contracts (6th Ed.) 409, note "t," says:

"The meaning of the rule is not very clear, nor is it easy to make a satisfactory classification of the cases in which it has been announced as the ground of decision."

And a master of equity jurisprudence and equity pleading (Prof. Langdell) is quoted in 1 Harv. Law Rev. p. 104, as having said in a lecture:

"The rule as to mutuality of remedy is obscure in principle and in extent, artificial, and difficult to understand and remember."

Perhaps as good a way as any of approaching a determination of the question whether the want of mutuality, in the particular stated, is sufficient of itself to defeat complainant's suit, is to consider the authorities cited by defendant's counsel on this point, and see if this case comes within the principles recognized and enforced in those cases. They cite, Bronson v. Cahill, 4 McLean, 19, Fed. Cas. No. 1,926; Ross v. Railway Co., 4 Woolw. 26, Fed. Cas. No. 12,080; Marble Co. v. Ripley, 10 Wall. 359, 19 L. Ed. 955; Pullman's Palace Car Co. v. Texas & P. R. Co., 11 Fed. 630, 4 Woods, 317; Duff v. Hopkins (D. C.) 33 Fed. 608; Norris v. Fox (C. C.) 45 Fed. 406; Strang v. Railroad Co., 41 C. C. A. 474, 101 Fed. 516; Blackett v. Bates, 1 Ch. App. 125; Ikerd v. Beavers, 106 Ind. 487, 7 N. E. 326.

The cases of Ross v. Railway Co., Pullman's Palace Car Co. v. Texas & P. R. Co., Strang v. Railroad Co., Blackett v. Bates, and Ikerd v. Beavers are alike in their essential characteristics. In each case the plaintiff was denied specific performance of the contract involved therein. The ground upon which the denial was based was that plaintiff's part of the contract was of a nature that specific performance thereof could not be decreed. It consisted in doing, and not in giving. The decree in suits for specific performance, where specific performance is granted, always decrees performance on both sides, and that without a cross-bill on part of defendant. Prof. Langdell, in his Brief Survey of Equity Jurisdiction, 1 Harv. Law Rev. 361, says that:

"Courts of equity * * * make it a condition of giving relief to the plaintiff that he shall submit to a decree made against him, also; and, indeed, they treat a plaintiff as so submitting by implication. Accordingly, whenever a decree is made for the performance of a bilateral contract, the two sides of which constitute mutual and concurrent conditions, the court will, if necessary, appoint a time and place for performance, and will require both parties to perform at such time and place concurrently; and, if either of them refuses or neglects so to perform, he will be punished for contempt on the application of the other."

This being so, it is readily seen that, if specific performance of plaintiff's part of the contract cannot be decreed, the defendant's should not be.

In the cases of Ross v. Railway Co. and Strang v. Railroad Co., the plaintiffs, respectively, had contracted to build a railroad; and the suits were brought against the defendants to compel them to permit them to build the railroads under the contracts, and to pay for same in accordance with the contracts. It is well settled that a court of equity will not decree specific performance of a contract to build a railroad, and, as decrees could not be entered compelling the plaintiffs to comply with their part of the contracts, plaintiffs were not entitled to such decrees against the defendants.

In the case of Strang v. Railroad Co., Simonton, J., said:

"The bill, in purpose and substance, is for the specific performance of a contract to build the road. If the court could undertake to order the defendant, on its part, to fulfill all the parts of its contract, it must order the plaintiff, on his part, to fulfill his contract; that is, to build the road. A contract, to be specifically performed, must be mutual. Fry, Spec. Perf. § 266. So the bill called upon the court to compel one party to build the railroad, and the other party to pay for it. This the court cannot do. A contract to build a railroad will not be enforced."

The case of Pullman's Palace Car Co. v. Texas & P. R. Co. was a suit to specifically enforce a contract for the lease of sleeping cars, to be run by defendant on its own trains over its own road. Pardee, C. J., said:

"No such decree or order should be rendered when there is not a mutuality of remedy between the parties, obtainable from the court. If the position of the parties were reversed, it does not seem that there could be any order for the Pullman Company to comply, because the court could not compel that company to build cars or purchase cars, or furnish cars sufficient to meet the requirements of travel over the extensive lines of the railroad company."

The case of Brackett v. Bates was a suit to enforce specific performance of an award of a certain lease. Lord Cranworth stated the ground of refusing the relief in these words:

"Had it been an agreement, would there have been a case for specific performance? I think not, and for this short and simple reason: That court does not grant specific performance unless it can give full relief to both parties. Here the plaintiff gets at once what he seeks,—the lease; but the defendant cannot get what he is entitled to, for his right is not a right to something which can be performed at once, but a right to enforce the performance by plaintiff of daily duties during the whole term of the lease. The court has no means of enforcing the performance of those duties. All it can do is to punish the plaintiff by imprisonment or fine if he does not perform them. The form of the decree itself shows want of jurisdiction." And again: "In order that the court may interfere, there must be mutual rights, capable of being enforced by the court. Now, here, if defendant had been willing to perform the award, and the plaintiff unwilling, could the defendant have filed a bill for specific performance of the agreement to keep the road in repair, or to supply the engine power? It is clear that such a bill could not be maintained. This disposes of the case. There is no mutuality."

The case of Ikerd v. Beavers was a suit to enforce specific performance of a contract to convey a certain tract of land in consideration of the agreement on the part of the vendee to take care of and support the vendor, during his life, on said land. Mitchell, J., thus stated the ground for refusing the relief sought:

"Besides being complete and definite, it [the contract] must belong to a class capable of being specifically enforced, and be of a nature that the court can decree its complete performance against both parties without add-

ing to its terms." And again: "Unless a contract can be specifically enforced as to both parties, a court will not interfere. Being unable to execute the contract against the plaintiff, nothing remained for the court in this instance except to decline to compel the execution of a deed in his favor."

It is thus seen that these five cases were all cases where at the time of the hearing a decree could not be entered, enforcing specific performance of the contract on plaintiff's part as well as the defendant's. This was not because it was not within plaintiff's power to do the thing which he had agreed to do. It was because of the nature of that thing. It was such that equity could not decree its specific performance. As, therefore, specific performance on plaintiff's part, as well as defendant's could not be decreed, it was inequitable, and contrary to the settled form of decrees in such cases, to decree specific performance on defendant's part alone. These cases, therefore, can have no application in the case in hand. Here, though want of mutuality existed when the contract was made, because complainant did not then have the stock and resignations which he agreed to deliver with his deeds, it has been removed, if the assumption on which we are proceeding, that he now has the stock and resignations, is correct. This contract can now be specifically enforced on both sides by the decree herein.

The cases of Marble Co. v. Ripley and Duff v. Hopkins may likewise be considered together.

In the case of Marble Co. v. Ripley, the latter had conveyed to the former property, including a large marble quarry. The contract provided that the Marble Company, as part of the consideration for the conveyance, should furnish Ripley with a certain amount of marble annually. Ripley claimed that the company had broken its contract, and brought the suit for specific performance. Mr. Justice Strong gave many reasons for the holding of the court that Ripley was not entitled to the relief he sought; said that "another" one was found "in the want of mutuality." The particular in which there was want of mutuality was that the contract provided that Ripley had a right to terminate it at any time on giving one year's notice. It was a case, therefore, of want of mutuality in point of obligation, and such want of mutuality would have continued to exist, had specific performance on the Marble Company's part been decreed. Granting specific performance under such circumstances would have been clearly inequitable.

The case of Duff v. Hopkins was a case where an assignee in bankruptcy entered into a contract with another for the release and conveyance to the estate of the bankrupt of certain real estate acquired from the bankrupt under execution sales against him, in consideration of certain payments to be made by the assignee. The suit for specific performance was against the vendor and his subsequent grantee. It was held that the assignee was not entitled to the relief sought, because of want of mutuality. The particular in which there was nonmutuality, and why it was sufficient to defeat the assignee's suit, is indicated by the following quotation from the opinion of Judge Acheson. He said:

"No one pretends that the assignee incurred individual liability, and, to give the agreement in question any binding effect against him in his repre-

120 F.—23

sentative character, the consent of the bankrupt court was a sine qua non. Now, the assignee alone could invoke the authority of that tribunal. The bank has no standing in that forum for such purpose. It is idle to speculate as to what might have been the result had the assignee made a timely application to the court, and obtained its sanction to the proposed compromise. The fact is that he did not move in the matter until after the expiration of the year within which the contemplated settlement should have been carried out to full completion. In the meantime the attitude of the parties had become one of antagonism."

This, therefore, was a case of nonmutuality in the matter of obligation and repudiation of the contract before any attempt had been made to remove the nonmutuality.

These two cases are certainly not applicable to the case in hand.

The remaining two cases cited by defendant, of Bronson v. Cahill and Norris v. Fox, may also be considered together. Both were cases of specific performance sought of a contract of sale of land, brought by vendor against vendee.

In Bronson v. Cahill, one of two joint owners of a tract of land made a contract to sell the land, as if he were the sole owner. The vendee did not know that it was owned by him jointly with another. He claimed to be acting for himself and as agent for his co-owner. After considerable delay, but within what was alleged to be a reasonable time, a deed was tendered, executed by both owners. The vendee refused to accept it, and a suit for specific performance of the contract was brought by the vendor and his co-owner. It was held that they were not entitled to the relief. There was some question as to whether the deed tendered was properly executed, and as to whether it was tendered within a reasonable time. But the decision was based "chiefly on the fact that there was a want of mutuality in the contract." The court said:

"There was nothing on the face of the agreement which could give the defendant a claim against Wood for his interest in the land. There was then a want of mutuality in the contract, and this is essential to a decree for a specific execution of the contract. Benedict v. Lynch, 1 Johns. Ch. 370, 7 Am. Dec. 484; Parkhurst v. Van Cortlandt, 1 Johns. Ch. 282; German v. Machin, 6 Paige, 288."

This is the extent of the consideration given to this question in the opinion. It is not entirely certain that the court realized the fact that the vendor's contract embraced his co-owner's interest in the land, as well as his own, and that the joint deed tendered was in performance of that contract on his part. It is possible that the court looked upon the transaction as if the vendee had no obligation for the co-owner's interest in the land, and that it was a case of nonmutuality in the obligation. It is certain that the co-owner who made no contract to convey his interest was a party seeking the enforcement of the vendee's contract, and the authorities relied on were cases of want of mutuality in obligation. But however this may be, it must be conceded that this case does decide that a half owner of land, who has made a contract of sale of the whole land, and in performance thereof has tendered a deed from himself and co-owner before any repudiation of the contract, is not entitled to specific performance of the contract.

In the case of Norris v. Fox, Norris agreed to procure for Fox,

from one Robbins, a warranty deed for certain land owned by Robbins, in exchange for certain land to be conveyed to him by Fox. Norris subsequently procured the deed from Robbins to Fox, and tendered it to Fox. Fox refused to accept it, and Norris brought suit for specific performance. It was held that he was not entitled to it. The ground upon which the decision was put by Judge Thayer was "want of mutuality in the contract, so far as the remedy for its enforcement is concerned." He said further:

"The rule is fundamental that a contract will not be specifically enforced unless it is obligatory on both parties, nor unless both parties, at the time it is executed, have the right to resort to equity for its specific enforcement." And again: "And where a contract, when executed, is not specifically enforceable against one of the parties, he cannot, by subsequent performance of those conditions that could not be specifically enforced, put himself in a position to demand specific enforcement against the other party." And again: "In the case at bar the agreement of Norris to procure a warranty deed of the land, at the time belonging to another, was of that nature that an action at law would lie for a breach of the agreement. As Fox could not compel specific performance of the contract when made, and only had his remedy at law by a suit for damages, the complainant must resort to the same remedy."

In regard to this case, it is to be noted in the first instance that the authorities cited by Judge Thayer in support of the first proposition quoted from his opinion were all authorities holding that a contract will not be specifically enforced where there is want of mutuality in obligation. Those cited in support of the second proposition so quoted are the case of Hope v. Hope, 8 De Gex, M. & G. 731, and Fry, Spec. Perf. (3d Am. Ed.) § 443. The latter authority is based upon the case of Hope v. Hope, so that really that case is the sole judicial support which that proposition has, other than the indorsement given to it by Judge Thayer. That was a suit by a wife against a husband to enforce specific performance of a contract entered into after a separation between them, whereby he was to pay her certain sums of money at certain stated periods. A part of the consideration for said contract was an agreement on the part of the wife not to oppose a suit for divorce instituted by him against her in the English courts. In answer to the position that this consideration was illegal, and therefore the contract based upon it could not be enforced, it was urged that, whatever objection there may have been to the agreement in its inception, part of it had been performed, and what remained to be performed was legal and unobjectionable. To this Lord Justice Turner responded:

"To hold that an agreement so objectionable as that this court would not perform it can be rendered capable of performance by the objectionable part of it having been carried into execution is a doctrine to which I cannot assent."

This is certainly not an authority for the proposition in support of which it is cited. It does not follow that, because the performance of an illegal contract will not entitle the party who has performed it to specific performance by the other party of his part of the contract, the performance of a contract not specifically enforceable when the contract was made, but entirely legal, may not entitle the party performing to specific performance of the other's part. It is thus seen that the authorities upon which the case of Norris v. Fox is based are

not cases whose facts were similar to the facts of that case. The mutuality cases relied on are all cases of want of mutuality in matter of obligation, and not of remedy, and the sole authority cited to the effect that performance of a nonenforceable contract, on one side, does not give right to specific performance on the other side, was a case where its nonenforceability was due to its illegality. It is to be noted further that it has been held, in cases whose facts were of a similar character to the facts of that case, that the sole effect of the nonmutuality, due to the inability of one party to perform his part of the contract when made, is to entitle the other party to rescind the contract at any time before the former has put himself in position to perform his part of the contract, and that, if the latter has not availed himself of this right before then, the former will be entitled to specific performance, notwithstanding the original want of mutuality. It has been so held in these cases, to wit: Farrer v. Nash, 35 Beav. 167; Wylson v. Dunn, 34 Ch. Div. 569. In Farrer v. Nash the plaintiff had contracted September 2, 1864, to make the defendant a lease of certain real estate for the term of 21 years. The former's sole interest in the premises was a lease for 20¼ years, and by reason of covenants therein he had no power to assign it or to sublet. September 22, 1864, he had tendered the defendant a lease, which he refused to accept because of such want of power. October 7, 1864, suit for specific performance of the contract was brought; and pending that suit, and before the hearing, the plaintiff obtained his landlord's consent to the lease to defendant, thus removing his want of power to make it. It was held that he was not entitled to specific performance. Lord Romilly, Master of the Rolls, said:

"It is to be observed that there was no mutuality, for the defendant could not have had a decree against the plaintiff to perform that contract, because the court does not attempt to compel a person to do what is impossible. The plaintiff had no power to grant the lease, and neither the court nor the defendant could have compelled him to do so."

He said further:

"The case was like that of a person undertaking to sell a property which does not belong to him. * * * If he [landlord] had made this statement in September, 1864, and Farrer had communicated it to Nash, there would have been an end to the question. But how long was Nash to go on, and wait to know whether Farrer could make out a good title? Farrer filed his bill in October, 1864, and it is proved that in January, 1865, he was not able to grant the lease he had agreed to grant; and he does not show that he was ever able to complete his contract until April, 1865. Is a person entitled to keep another in suspense during that time? If so, it may go any length of time."

And again he said:

"I am of the opinion that when a person sells property which he is neither able to convey himself, nor has the power to compel a conveyance of it from any other person, the purchaser, as soon as he finds that to be the case, may say, 'I will have nothing to do with it.' The purchaser is not bound to wait and see whether the vendor can induce some third person (who has the power) to join in making a good title to the property itself."

In the case of Wylson v. Dunn the vendor did not own the land which he contracted to sell, or any interest in it, at the time of the making of the contract. This fact was known to the vendee. Subse-

quently the vendor obtained full ownership thereof, and tendered a deed to the vendee. The latter refused to accept it, and the former brought suit for specific performance. It was held that he was entitled to the relief sought. Kekewich, J., in speaking of the doctrine of mutuality, said:

"It is a technical doctrine, but, like many other technical doctrines, founded on common sense. It comes simply to this: that one party to a bargain shall not be held bound to that bargain, when he cannot enforce it against the other. If the contract is not mutually enforceable, it is a voidable contract; that is, it may be avoided as soon as the person who has a right to avoid it discovers that the cause or occasion for so doing occurs."

He said further:

"If a man contracts to sell an agreement for a lease, and it turns out that he has not got an agreement for a lease, the purchaser, when he finds that to be so, may say: 'I will not enter into it. I am entitled to be off, and I am off. I have contracted to buy that which you have not to give, and therefore you cannot enforce any contract against me.' That is one of the cases, and a very simple case. * * * But there arises the question whether this power of avoidance for nonmutuality is applicable to the case where the nonmutuality is apparent in the first instance, and is an essential part of the bargain. * * * But the doctrine of nonmutuality—the doctrine that a purchaser may avoid a contract when he discovers that his vendor has not got that which he contracted to sell—seems to me altogether inapplicable to a case where the vendor in the first instance tells the purchaser, and the purchaser knows from the circumstances of the case, that the vendor has no title, and is not likely to have one for some time. Is not such a contract as I have just described determinable by the purchaser on notice? I think it is. I think that a purchaser, having entered into such a contract as I have suggested, is entitled at any time to say: 'You have not got that land, yet I hoped you would have got it by this time. I do not care now to have the land, and I determine the contract.' If in the meantime the vendor had incurred expense, it may be that he would have a right of action against the purchaser for expenditures incurred and labor bestowed at the purchaser's request, but that is not specific performance. The purchaser might, I think, in the case I am suggesting, get off the contract by notice, and say: 'You are not in a position to convey or perform your contract, and therefore I am off.' But when must the notice be given? Must it be given some time before the vendor gets that which enables him to perform his contract? Must not the purchaser be active, and bring the matter to an end before it has been brought to an end on the other side? That is certainly my conviction, applicable to such a case."

The obiter expressions in the opinion in case of Farrer v. Nash, and its implication, and the decision in the case of Wylson v. Dunn, are therefore to the effect that the original nonmutuality in such contracts as were involved in those cases is not sufficient, in and of itself, without regard to and irrespective of other considerations, to defeat the vendor's right to specific performance. It is necessary, in addition, that the vendee should, before the vendor has put himself in position to comply with his contract and to demand performance on the part of the vendee, to notify the vendor of the fact that he will not accept the property if procured. If the vendor obtains the property, and places himself in such position before receipt of such notice, he is entitled to specific performance, notwithstanding the original nonmutuality.

In regard to the case of Norris v. Fox, it is still further to be noted that certain authorities, which may be considered to be in line with

it, do not lay stress upon the original inequality between the vendor and vendee in the particular in question, as the ground of the rule which they lay down, but upon the speculative character of the vendor's contract.

In the case of Townshend v. Goodfellow (Minn.) 41 N. W. 1056, 3 L. R. A. 739, 12 Am. St. Rep. 736, Vanderburgh, J., said:

"The defendants contend that the court ought not to enforce the contract in favor of the plaintiff vendor, because it appears that at the time the contract was made he had no title to the premises, and that equity will not actively interfere to aid a party who makes a contract to sell lands of which he is not the owner."

The rule as insisted on by the defendants is only applicable where a party has no interest in the lands which he agrees to convey, but volunteers to enter into a contract as a mere venture. Such a transaction will not be sanctioned by a court of equity, because it is a mere speculation, and one who speculates upon that which he has no contract, or the means of acquiring it, is not a bona fide contractor. Bisp. Eq. p. 437, says:

"But this doctrine will not be carried to the extent of holding that a vendor is entitled to specific performance if he had no title at the date of the contract, although he may have subsequently acquired one; for one who speculates upon that which is not within his control is not a bona fide contractor, and there is no mutuality between the parties."

Eaton, Eq. p. 548, says:

"But if the vendor had no title at the time the contract was executed, equity will not interfere to compel specific performance of the contract, even if the vendor subsequently acquires a title. Such a transaction is speculative, and the vendor is not a bona fide contractor."

But whatever may be the extent of the rule in such cases,—whether the vendor in no contingency will be entitled to specific performance, or will be entitled to it if he obtains the property before time of performance, and notification from the vendee that he claims the right to be off from the contract, and whatever may be the foundation of the rule, the original nonmutuality of the contract, or its speculative character, it is certain that the rule has application only to cases where the vendor is without that which he agreed to convey or any interest in it. It has no application to a case where the vendor has title to some extent, but it is defective or incumbered in some particular. This is recognized in the opinion rendered by the supreme court of Minnesota, and by the text-writers from which we have just quoted; and, in immediate connection with that which we have quoted, Vanderburgh, J., continues the above statement of the law as follows:

"But the general rule is that, where a contract is entered into in good faith, it is not necessary that the vendor be actually in the situation to perform it at the time it is entered into, provided he be able at the proper time to place himself in that situation. Imperfections in the title when the contract is made will form no ground of objection thereto, if removed before the time of completing the purchase."

Bispham precedes the above statement quoted from him by this:

"It may be added here that it has been decided that a court of equity will decree specific performance if the vendor is able to make a good title at any time before final decree."

Eaton precedes that quoted from him by this:

"And a court of equity will compel a purchaser to complete his contract for the purchase of lands if the vendor is able to make good the title at any time before the final decree of the court is pronounced, and the vendor will be permitted to remedy the defects in the title if he can do so within a reasonable time."

Of course, these authorities, in laying down this proposition of law, assume that it is only applicable where time is not of the essence of the contract. And they go to the extent of enforcing specific performance, even though the nonmutuality exists at the time suit is brought, and hold that it may be cured at any time before defense. Support of it may be found in the following decisions of the supreme court of the United States, to wit: Hepburn v. Auld, 5 Cranch, 262, 3 L. Ed. 96; Hepburn v. Dunlop, 1 Wheat. 179, 4 L. Ed. 65; Watts v. Waddle, 6 Pet. 402, 8 L. Ed. 437. It has also found recognition in the following recent decisions of the court of appeals of Kentucky, to wit: Logan v. Bull, 78 Ky. 607; Smith v. Cansler, 83 Ky. 371; Tapp v. Nock, 89 Ky. 414; 12 S. W. 713; Collins v. Park, 93 Ky. 6. 18 S. W. 1013.

Holt, J., in Smith v. Cansler, said:

"Mutuality of obligation is, in general, necessary to the validity of a contract; and it is a general rule that, in order to be binding, it must be enforceable by either party. If, however, one is not invested with such a title as he undertakes by his contract to make to a purchaser, yet if time be not of the essence of it, and he is able to make title when the time for performance arrives, and tenders the deed, then it will be enforced, although his title was defective at the date of the contract; and in such a case, if a rescission be asked by the other party, and the vendor is not able at the time of the institution of a suit for this purpose to comply with the contract, yet, if he can perfect the title within a reasonable time, the court will afford him an opportunity to do so."

Indeed, it has received well-nigh universal recognition by the courts and text-writers, and is involved in the proper practice as to putting title in issue and ascertaining it. That practice is thus referred to by Prof. Langdell in his Brief Survey of Equity Jurisdiction, 1 Harv. Law Rev. p. 369:

"The court takes upon itself the burden of ascertaining whether the vendor has such a title as the vendee is bound to accept; and that, too, whether the vendor or the vendee be plaintiff in the suit. Thus, if the vendor be plaintiff, he is not required either to allege or prove that his title is good, nor is the vendee required to allege or prove the contrary, but the pleadings and proofs assume the plaintiff is able to make a good title; and, if the questions raised by the pleadings and proofs be decided in the plaintiff's favor, a decree is made that the contract be specifically performed, provided the plaintiff be able to make a good title, and that the cause be referred to a master, to report whether a good title can be made. So, though the vendee be the one who seeks specific performance, he is not regarded as submitting to perform on his part, except upon condition that he can have a good title; and, therefore, if a decree be made in his favor, it must be in the same form as when the vendor is plaintiff, unless the vendee declare himself satisfied with the vendor's title, and waive any reference to a master in regard to it. The result is, therefore, a reference as to title is an incident to every specific performance in equity of a contract for the purchase and sale of land, unless such reference be waived by the vendee."

How far the case of Bronson v. Cahill is reconcilable with these authorities, it is not necessary to determine. The authorities go even

further than this. They hold that in certain cases, though that which is necessary to make that which is sold complete has not been obtained at all, and the nonmutuality remains to the end, the vendor is entitled to specific performance. They are cases where that which is lacking is not material to the enjoyment of that which is not lacking, and compensation can be awarded for it. In the case of Foley v. Crow, 37 Md. 51, Alvey, J., said:

"There is no doubt that the vendee of an estate in an unexecuted contract is entitled to have that for which he contracts, before he can be compelled to part with the consideration he agreed to pay, and that the ability of the vendor to convey should exist when his duty by the contract arises to convey, or at the time of a decree for a conveyance, where time is not of the essence of the contract. * * * But it does not necessarily follow from this general rule that there is no case of specific execution at the instance of the vendor unless he has ability to convey in strict and exact compliance with the contract as to the quantity or extent of the subject-matter sold. On the contrary, notwithstanding the general rule thus stated, there are many cases, owing to special circumstances, where the vendor may obtain specific performance of the contract in equity, although he may not be able to convey to the vendee to the full extent bargained for. And if in any case the contract be one that is fit and proper to be thus executed on the application of the vendor, it is clear the vendee can have no option to rescind it, in view of a court of equity, whatever may be his right at law. In a case where the vendor is unable, from any cause not involving mala fides on his part, to convey each and every parcel of the land contracted to be sold, and it is apparent that the part that cannot be conveyed is of small importance, or is immaterial to the purchaser's enjoyment of that which may be conveyed to him, there the vendor may insist on performance, with compensation to the purchaser, or a proportionate abatement from the agreed price of what has not been paid. This cannot, however, be done where the part in reference to which the defect exists is a considerable portion of the entire subject-matter, or is in its nature material to the enjoyment of that part about which there is no defect. To this effect the authorities are abundant and decisive."

Of course, specific performance will not be granted in such cases unless compensation can be made for what is not conveyed. But there is an absence of strict mutuality in them; it being considered inequitable to deny specific performance where compensation can be had, and the part not conveyed is not essential to that which is.

It is evident, therefore, that the case of Norris v. Fox is not applicable to the case in hand, either in the point decided, or in the ground upon which it was so decided, even conceding that it was correctly decided. This is not a case where complainant was absolutely without title to that which he agreed to sell to the defendant. So far as the defense at present upon consideration is concerned, it must be accepted that complainant has, and since the execution of the contract has had, an absolute and unincumbered title to the distillery plant and personal property sold, which was the principal subject of the contract. The only particular in which he was lacking when the contract was made, as to the stock in, and resignations of the directors of, his assignor, the T. J. Megibben Company, and the nonmutuality in point of remedy existing at that time, was as to a matter entirely collateral. This case, therefore, is not the case decided in Norris v. Fox. Nor is the ground upon which that case was decided, to wit, nonmutuality in matter of remedy existing at the time when the contract was made, applicable to this case, because applied there. As

we have seen, though it may have been applicable to that case, it is not a principle of universal application. There are cases where it does not apply.

The result, then, of our consideration of the authorities cited by counsel for defendant in support of the position that complainant is not entitled to specific performance, because of nonmutuality in the particular stated, is to show that they do not uphold that position. And we are not aware of any that do. On the contrary, it seems to the court that the principle applied in the authorities cited, to the effect that a court of equity will enforce specific performance when time is not of the essence of the contract, even though the vendor's title is defective when suit is brought, is against that position. Likewise the general rule applicable to suits for specific performance, as stated by Mr. Justice Field in the case of Willard v. Tayloe, supra, in these words:

"In general it may be said that the specific relief will be granted when it is apparent, from a view of all the circumstances of the particular case, that it will subserve the ends of justice, and that it will be withheld when, from a like view, it appears that it will produce hardship or injustice to either of the parties."

And also the rule which guides courts of equity in all suits, as laid down in the following language of Mr. Justice Campbell in the case of Secombe v. Steele, 20 How. 106, 15 L. Ed. 833:

"Courts of equity make a distinction in all cases between that which is matter of substance and that which is matter of form; and, if it find that by insisting on form the substance will be defeated, it holds it inequitable to allow a person to insist on such form, and thereby defeat the substance."

To hold that the mere want of mutuality existing at the time the contract was made, in matter of remedy, as to something that was entirely collateral to the main subject of the contract, and not of very great value to the defendant, is to defeat complainant's right to specific performance of the contract, would, in view of all the circumstances of this case, be to adhere to the matter of form, and lose sight of matter of substance. Counsel for defendant suggests that it will be a great hardship to defendant, after the lapse of nearly three years without operation of the distillery, and probable consequent deterioration of the property and depreciation in value, to have to take the property and pay for it. That may be true, but it is a matter of defendant's own bringing about. On the other hand, it will be a hardship to complainant to have to keep the property under such circumstances, and hunt up another purchaser, when the present condition of things was brought about through no instrumentality of his. If any one is to suffer for the delay, it should be that party who is responsible for it.

For these reasons given, the court does not think that defendant has made good any of its defenses, but that complainant is entitled to a decree.